1   DAVID W. OGDEN*
    David.Ogden@wilmerhale.com
2   KELLY P. DUNBAR*
    Kelly.Dunbar@wilmerhale.com
3   WILMER CUTLER PICKERING
        HALE AND DORR LLP
4   1875 Pennsylvania Avenue NW
    Washington, DC 20006
5   Telephone:   (202) 663-6440
    Facsimile:   (202) 663-6363
6   *Attorneys for Plaintiff* **DaVita Inc.**

7   KELSI CORKRAN*
    kcorkran@orrick.com
8   ORRICK HERRINGTON &          STUART S. KURLANDER*
        SUTCLIFFE LLP             stuart.kurlander@lw.com
9   1152 15th Street NW           MICHAEL E. BERN*
    Washington, DC 20005          michael.bern@lw.com
10  Telephone:   (202) 339-8497   LATHAM & WATKINS LLP
    Facsimile:   (202) 339-8400   555 Eleventh Street NW
11  *Attorneys for Plaintiffs* **Fresenius**   Washington, DC 20004
    **Medical Care Holdings, Inc., d/b/a**     Telephone:   (202) 637-1021
12  **Fresenius Medical Care North**           Facsimile:   (202) 637-2201
    **America, and Fresenius Medical**         *Attorneys for Plaintiff* **U.S. Renal**
13  **Care Orange County, LLC**                **Care, Inc.**

14              **UNITED STATES DISTRICT COURT**

15              **CENTRAL DISTRICT OF CALIFORNIA**

16                  **SOUTHERN DIVISION**

17  FRESENIUS MEDICAL CARE ORANGE
    COUNTY, LLC; DAVITA INC.;
18  FRESENIUS MEDICAL CARE              Case No. 8:19-cv-02130
    HOLDINGS, INC., d/b/a Fresenius Medical
19  Care North America; U.S. RENAL CARE,    **COMPLAINT FOR**
    INC.,                                   **INJUNCTIVE AND**
20              *Plaintiffs*,               **DECLARATORY RELIEF**

21          v.

22  XAVIER BECERRA, in his official capacity
    as Attorney General; RICARDO LARA, in
23  his official capacity as California Insurance
    Commissioner; SHELLEY ROUILLARD, in
24  her official capacity as Director of the
    California Department of Managed Health
25  Care; and SONIA ANGELL, in her official
    capacity as Director of the California
26  Department of Public Health,
                *Defendants*.
27  _____

28      * *Pro hac vice* forthcoming.  Additional counsel listed on signature page.

1  Plaintiffs Fresenius Medical Care Orange County, LLC; DaVita Inc.;

2  Fresenius Medical Care Holdings, Inc., d/b/a Fresenius Medical Care North

3  America; and U.S. Renal Care, Inc. ("Plaintiffs") hereby allege and state:

4  **INTRODUCTION AND NATURE OF ACTION**

5  1.   This lawsuit challenges a recently enacted California law—Assembly

6  Bill 290 ("AB 290")[1]—that imposes burdensome and punitive regulations on

7  persons suffering from a specific life-threatening illness, their medical providers,

8  and a leading national charity that has long helped these patients secure health care

9  needed to keep them alive.  AB 290 deliberately targets a decades-old charitable

10  premium assistance program that has long provided vital financial assistance to

11  highly vulnerable people suffering from kidney failure, also known as end-stage

12  renal disease ("ESRD").  Doctors, patients' organizations, and countless other

13  groups have warned that AB 290 will be a catastrophe for patients—particularly

14  the low-income, minority patients that are disproportionately affected by ESRD—

15  by threatening their ability to receive and afford life-saving treatment at dialysis

16  clinics in California, including those operated by Plaintiffs.  But AB 290 is not

17  only harmful to vulnerable patients in this State, it is also unconstitutional.  On

18  behalf of themselves and the ESRD patients that each Plaintiff treats, Plaintiffs

19  bring this action under the Constitution of the United States and federal law

20  seeking equitable and declaratory relief against Defendants—all state officers sued

21  in their official capacity—to bar the enforcement and application of AB 290.  The

22  Court has subject matter jurisdiction under 28 U.S.C. § 1331 and 42 U.S.C. § 1983

23  because Plaintiffs allege an imminent violation of their rights under the

24  Constitution of the United States.

25  2.   For almost five decades, the American Kidney Fund, Inc. ("AKF")—a

26  bona fide Section 501(c)(3) organization and leading national charity—has been

27

28  [1] An authenticated copy of AB 290, as filed with the Secretary of State, is attached to this complaint as Exhibit A.

the primary source of direct financial support helping patients suffering from ESRD pay for health insurance.  Patients afflicted with ESRD cannot survive without a kidney transplant or dialysis treatment.  The demands of treatment—multiple sessions of multiple hours every week—also make it extremely difficult for them to hold or obtain jobs.  Because the costs of dialysis treatment are very high, because access to dialysis is a matter of life and death, and because of the unique economic vulnerability of many ESRD patients, AKF has long provided charitable aid to eligible ESRD patients to help them pay for the public or private health insurance of their choice, often allowing them to continue to afford coverage they had before their ESRD diagnosis.  AKF's charitable assistance program—which has operated under federal guidance for decades—has provided a crucial safety net for ESRD patients that has almost certainly saved thousands of lives by enabling access to life-saving health care patients could not otherwise afford.

3.     If permitted to take effect, AB 290 will remove that safety net.  The product of strong-arm politics by a labor union that has been unsuccessful in organizing dialysis employees and other special interests that hope to benefit financially from the law, AB 290 directly and intentionally targets for arduous and punitive regulatory burdens not only AKF but also ESRD patients, dialysis providers, and AKF's donors and supporters.  AB 290 is a hastily written and ill-conceived law that will be a disaster for public health in this State.  It is also unconstitutional in many respects.

4.     AB 290 violates the First Amendment in several ways.  The law imposes numerous burdens on the associational and expressive rights of Plaintiffs and their patients, triggering heightened First Amendment review.  AKF is a charitable organization dedicated to advancing the interests of ESRD patients, and Plaintiffs' associations with and contributions to AKF are constitutionally protected—as are the associations of individual ESRD patients that receive AKF support.  AB 290 directly interferes with and severely burdens those protected

activities in multiple respects.  First, the law imposes financial penalties on dialysis providers for contributing financially to AKF's cause—sharply taxing and punishing providers' speech and association while restricting the flow of funding AKF relies on to carry out its mission.  Second, the law punishes patients' associational activities by compelling AKF to disclose to private insurers the names of ESRD patients receiving financial aid, private information that AKF has indicated it would otherwise hold in confidence.  Third, the law imposes sweeping and ill-defined restrictions on dialysis providers' communications with ESRD patients, speech restrictions that interfere with objective, fact-based education that providers offer to ESRD patients regarding insurance options.  These abridgements and burdens trigger heightened constitutional scrutiny.

5.      None of these burdens can survive the heightened constitutional scrutiny that applies.  The First Amendment protects medical providers', patients', and charities' rights to speak and associate for the purpose of empowering patients to obtain life-saving medical care, and the State cannot justify its invasion of those rights.

6.      AB 290 recites that its supposed objective is to prevent the "steering" of patients onto private instead of public insurance and thus, according to the State, to (i) "protect the sustainability of risk pools within the individual and group health insurance markets" and (ii) "shield patients from potential harm caused by being steered into coverage options that may not be in their best interest."  AB 290 § 1(i).  Neither purported justification is remotely persuasive.  To begin with, more than half of patients receiving charitable premium assistance are covered by public insurance—not private—and have no impact on private individual or group health insurance markets.  Yet they will lose their assistance under AB 290.  Moreover, the minority of such patients who choose private insurance do not do so because they are steered into making that choice.  To the contrary, the minority of patients choosing private insurance do so overwhelmingly either because they wish to

maintain existing private coverage or because private insurance offers substantial benefits over public insurance for them—such as coverage for those who are ineligible for public insurance, greater access to care (such as dental care, which is of particular importance to ESRD patients), improved access to transplants, and coverage of family members, all of which is often not available from public insurance.  The State's claim that AB 290 benefits patients is false.  In fact, for patients with both private *and* public coverage, AB 290 is very harmful.  That is why the bill was opposed by Dialysis Patient Citizens—the largest national advocacy group for ESRD patients—the California State Conference of the NAACP, and others who represent patients' interests.  It is also why the law was opposed by significant parts of the medical community, including the California Medical Association.

7.     Even had the State identified a genuine problem with steering or insurance premiums, AB 290 is not remotely tailored to address those supposed harms.  If the State's concern was that some patients were somehow improperly steered to health plans that were not in their interest, the solution would be tailored anti-steering controls—not a complicated regime prohibiting medical providers from communicating with patients, requiring the exposure of patients receiving charitable assistance to insurers, and imposing a punitive reimbursement penalty on dialysis providers that contribute to AKF.

8.     Nor is AB 290 remotely tailored to address the cost of insurance premiums.  The State's assertion that charitable assistance contributes to higher insurance premiums is factually unfounded.  More fundamentally, not a single provision in AB 290 requires insurance companies (the law's principal financial beneficiaries) to use any money gained as result of AB 290 to lower insurance premiums for California residents, rather than pad their own bottom line.  By contrast, in driving AKF from California, AB 290 will force countless low-income patients to pay for Medicare premiums and secondary coverage plans

themselves—imposing thousands of dollars of added costs on ESRD patients who can ill-afford to bear them, if they can afford them at all.  As such, AB 290's overbroad, punitive, and significant burdens on speech and associational rights inflict far more harm on First Amendment-protected activity than is necessary.

9.     AB 290 does not just violate the First Amendment.  It is also preempted under federal law.  It has long been a paramount objective of Congress to protect ESRD patients.  Congress has taken numerous steps over the past five decades to ensure that ESRD patients have access to quality health care, to provide a range of health insurance options (both public and private) to ESRD patients to pay for that care, and to protect the financial integrity of the dialysis system as a whole.  AB 290 shatters the unique coverage system Congress created for ESRD patients by forcing AKF to cease operations in California, depriving more than 3,700 ESRD patients of access to financial assistance used to pay for public or private insurance.

10.    As AKF repeatedly made clear to the State, unless AB 290 is enjoined, AKF will be forced to cease operations in California, all but ending charitable premium assistance for ESRD patients.  Those patients will either lose their insurance of choice or lose insurance coverage altogether.  Patients who are ineligible for Medicare or Medicaid will likely find themselves without health insurance.  And even those patients with public insurance may be unable to pay the significant associated costs currently covered by AKF.  This will impose an insuperable obstacle to congressional efforts to protect patient choice of insurance and control Medicare spending.  But more tragically, AB 290 will trigger an ESRD health-care crisis in the State—a crisis that will defeat multiple federal objectives.  Many dialysis clinics in California are economically viable only because some of their patients have private rather than public insurance.  AB 290 upsets that arrangement by forcing many patients off private insurance or causing them to lose insurance altogether, and beyond the adverse consequences for those patients, this

1    outcome will be financially ruinous for many clinics and will throttle incentives to

2    invest in needed new clinics.  All of this will imperil continued access to life-

3    sustaining dialysis care for ESRD patients.  Because the Supremacy Clause cannot

4    tolerate AB 290's disruption of the balance the federal government has established

5    with respect to ESRD patients and the unique coverage system resulting from

6    congressional policymaking, AB 290 is preempted.

7        11.    Set to take effect on January 1, 2020, AB 290 will inflict deep, lasting,

8    and irreversible harm on the vital safety net that charitable premium assistance has

9    long provided for ESRD patients in California—to the detriment of Plaintiffs and

10   the ESRD patients whom they treat.  Because AB 290 is unconstitutional as

11   applied to Plaintiffs and ESRD patients, AB 290 must be enjoined.

12                    **JURISDICTION AND VENUE**

13       12.    The Court has subject matter jurisdiction under 28 U.S.C. § 1331 and

14   42 U.S.C. § 1983 because Plaintiffs allege an imminent violation of their rights

15   under the Constitution of the United States.

16       13.    The Court may declare the legal rights and obligations of the parties in

17   this action pursuant to 28 U.S.C. § 2201 because the action presents an actual

18   controversy within the Court's jurisdiction.

19       14.    Venue is proper in this judicial district under 28 U.S.C. § 1391(b).

20   All Defendants are residents of California and perform their official duties

21   throughout the State, including in the Central District.  Defendant Becerra oversees

22   an Office of the Attorney General in the Central District.  Defendant Lara oversees

23   multiple regional offices of the California Department of Insurance in the Central

24   District.  Defendant Angell oversees multiple district offices of the California

25   Department of Public Health in the Central District.  In addition, a substantial part

26   of the events giving rise to the claims in this Complaint arose in this District,

27   because AB 290 is state law that will be enforced throughout the State, including in

28   this District.  Plaintiff Fresenius Medical Care Orange County, LLC, resides in this

District.  Plaintiffs DaVita Inc., Fresenius Medical Care North America, and U.S. Renal Care, Inc., collectively own or operate over 250 centers in this District.

## THE PARTIES

15.     Plaintiff Fresenius Medical Care Orange County, LLC, is a limited liability company that owns and operates seven dialysis clinics, all in Orange County, California.  The clinics provide dialysis and renal care services to 500 patients with chronic kidney failure and ESRD.

16.     Plaintiff DaVita Inc., through its DaVita Kidney Care Division, is a leading provider of kidney care in the United States, delivering dialysis services to patients with chronic kidney failure and ESRD.  DaVita owns, operates, or provides services at 319 in-center dialysis facilities in California, serving approximately 37,500 patients, including 2,880 patients in Orange County.  As of December 31, 2018, DaVita operated or provided administrative services at 2,664 outpatient dialysis centers in the United States, serving approximately 202,700 patients.

17.     Plaintiff Fresenius Medical Care Holdings, Inc., d/b/a Fresenius Medical Care North America ("FMCNA") is a health care company focused on delivering the highest quality care to people with renal and other chronic conditions.  Since its formation, FMCNA has grown into the largest vertically integrated dialysis provider in North America and its employees are dedicated to the mission of delivering superior care that improves the quality of life for people with kidney disease, including end-stage renal disease, better known as kidney failure.  FMCNA owns, operates, or provides administrative services to over 2,400 dialysis clinics in the United States, serving approximately 200,000 patients.  In California, FMCNA serves roughly 16,800 patients at 145 in-center dialysis clinics across the State, including approximately 2,000 patients in Orange County.

18.     Plaintiff U.S. Renal Care, Inc. ("USRC") was founded in 2000 with the goal of ensuring the company provides services of the highest quality to

1    patients with chronic and acute renal disease.  USRC owns, co-owns, and manages

2    hundreds of dialysis facilities across the United States.  USRC's dialysis facilities

3    provide both in-center and in-home dialysis services for ESRD.  The company also

4    manages several acute-setting dialysis programs in conjunction with local hospitals.

5    USRC serves approximately 26,000 patients across 31 States and the Territory of

6    Guam, making it the third-largest dialysis-provider chain in the United States by

7    number of patients.  USRC owns, co-owns, or manages 45 dialysis clinics in

8    California, including home dialysis programs.

9        19.    Defendant Xavier Becerra is the California Attorney General.  The

10   Office of the Attorney General is responsible for enforcing California's civil and

11   criminal laws, including AB 290.  *See, e.g.*, AB 290 § 3 (to be codified at Cal.

12   Health & Safety Code § 1367.016(k)), § 5(k) (to be codified at Cal. Ins. Code

13   § 10176.11(k)).[2]

14       20.    Defendant Shelley Rouillard is the Director of the Department of

15   Managed Health Care.  The Department of Managed Health Care oversees and

16   enforces the regulation of managed health care plans, such as HMOs, in California.

17   The Department will administer and enforce provisions of AB 290 relating to

18   "health care service plans" under the Health and Safety Code.  *See* AB 290 §§ 3, 7.

19       21.    Defendant Ricardo Lara is the California Insurance Commissioner.

20   The California Insurance Commissioner oversees the California Department of

21   Insurance, which will administer and enforce provisions of AB 290 relating to

22   "insurers" under the Insurance Code.  *See* AB 290 §§ 5, 6, 7.

23       22.    Defendant Sonia Angell is the Director of the California Department

24   of Public Health.  The California Department of Public Health is charged with

25 ───────────────

26       [2] Sections 2 through 6 of AB 290 each add one provision to the California
     Health & Safety and/or Insurance Code.  Because these provisions have not yet

27   been codified, the Complaint cites the relevant portion of AB 290, rather than the
     relevant provision of the Code—so, for instance, AB 290 § 3(c), rather than Cal.

28   Health & Safety Code § 1367.016(c).

1    enforcing provisions of law (including those added by AB 290 § 2) relating to

2    dialysis clinics.  *See* Cal. Health & Safety Code §§ 1200-1245.

3                            **FACTUAL ALLEGATIONS**

4    **I.     ESRD PATIENTS ARE AMONG SOCIETY'S MOST VULNERABLE**

5           23.    ESRD is the last stage of chronic kidney disease.  At this stage, the

6    kidneys can no longer filter and clean blood.  Without kidney dialysis or a kidney

7    transplant, a person diagnosed with ESRD will die within a short time.  Although

8    transplantation is generally the more desirable treatment option, the shortage of

9    suitable donors and risks associated with surgery may delay and often preclude this

10   treatment.  The vast majority of ESRD patients therefore need dialysis.

11          24.    Dialysis is a process that simulates the action of a working kidney,

12   cleaning blood and removing excess fluid.  It is a well-established medical

13   treatment that has been used in the United States to treat ESRD patients for

14   decades.  The first outpatient dialysis facility was established in 1962; within a

15   decade, dialysis had become the standard treatment for ESRD patients.  Today,

16   almost all ESRD patients rely on dialysis for survival.

17          25.    Dialysis treatments must be done at least three times per week and

18   ordinarily last four hours each time.  Most patients receive outpatient treatment at a

19   dialysis clinic, ideally one that is close to work or home.  Some receive treatment

20   in a home-based setting, but still require periodic visits to an outpatient facility.

21          26.    According to the United States Renal Data System, there were more

22   than 510,000 ESRD dialysis patients in the U.S. in 2016.  The ESRD patient

23   population has grown at an average annual rate of approximately 3.8% from 2000

24   to 2016, the latest period for which such data is available.  The increase is

25   attributable to the aging of the U.S. population, higher incidence rates for diseases

26   that cause kidney failure such as diabetes and hypertension, lower mortality rates

27   for dialysis patients, and growing minority populations that have

28

1    disproportionately high incidence rates of ESRD.  In California, incidence of

2    ESRD has grown at an annual 5% rate over the past 10 years.

3        27.    ESRD patients are highly vulnerable.  ESRD disproportionately

4    impacts racial and ethnic minorities, particularly African-American and Hispanic

5    populations, in the United States:  Compared to white Americans, black Americans

6    are about 3.7 times more likely to suffer from ESRD, Hispanic and Asian

7    Americans are 1.5 times more likely, and Native Americans are 1.4 times more

8    likely.  Many ESRD patients have extremely limited means—they are some of the

9    poorest people in society.  The disease exacerbates these patients' vulnerability

10   because dialysis is very expensive, and the length and frequency of treatment

11   commonly impedes continued employment.

12       28.    In California, over 650 dialysis clinics treat more than 70,000 ESRD

13   patients.  Of those California patients, approximately 43% are Hispanic, and 14%

14   are African American.

15       29.    Plaintiffs are among the providers of these life-saving dialysis

16   services in California.  Dialysis services in California are also provided by various

17   non-profit dialysis providers and by other for-profit providers as well.  To satisfy

18   increasing demand for dialysis services in California, it is estimated that

19   approximately 350 additional clinics will be needed over the next decade.

20   **II.   CONGRESS HAS LONG OVERSEEN ESRD PATIENTS' ACCESS TO CARE AND**

21       **CHOICE IN HEALTH INSURANCE OPTIONS**

22       30.    In 1972, Congress amended Medicare to extend insurance to the

23   permanently disabled, regardless of age—and for the first time explicitly included

24   a specific disease, namely ESRD.  *See* Social Security Amendments of 1972, Pub.

25   L. No. 92-603, tit. II, § 299I, 86 Stat. 1463 (codified as amended at 42 U.S.C.

26   § 426-1(a)).  In doing so, Congress sought to create "a national program of kidney

27   disease treatment assistance" to ensure Americans would not "die … from kidney

28   disease who could have been saved if they had been able to afford [dialysis]."  S.

Rep. No. 92-1230, at 1243-1244 (1972) (statement of Sen. Hartke). Today, ESRD is one of only a handful of diseases that generally makes a person eligible for all benefits available under Medicare regardless of age. *See* 42 U.S.C. § 426-1(a).

31. Critically, Congress did not require ESRD patients to enroll in Medicare. Rather, Congress gave them a choice: Unlike Medicare enrollees over age 65, who must enroll in Medicare, ESRD patients under that age are free (with certain exceptions) to defer enrollment in Medicare without facing late-enrollment penalties. *See* 42 U.S.C. § 426-1(b). In the four decades since Congress established the ESRD Medicare entitlement, Congress has continued to take deliberate steps to ensure and preserve a critical role for private insurance in covering ESRD patients.

32. The expansion of Medicare to ESRD patients in 1972 prompted private insurers to exclude ESRD treatments from coverage. As a result, ESRD patients were forced to shift from private coverage to Medicare, and Medicare was forced to bear almost all of the costs associated with treating ESRD. *See* S. Rep. No. 97-139, at 469 (1981) (explaining that private "plans now pay little, if anything, toward the costs of kidney dialysis treatments").

33. In 1981, Congress amended the Medicare Secondary Payer Act ("MSP Act") to address these problems. The MSP Act was enacted in 1980 "to reduce federal health care costs" by "mak[ing] Medicare the secondary payer for medical services provided to Medicare beneficiaries whenever payment is available from another primary payer," such as a group health plan. *United Seniors Ass'n, Inc. v. Philip Morris USA*, 500 F.3d 19, 21 (1st Cir. 2007). In 1981, Congress amended the MSP Act to create a special ESRD "coordination period" to address the problems described above—guaranteeing that ESRD patients could remain on their employer-sponsored group insurance plans and requiring those private insurers to assume primary financial responsibility for patients' care for a "coordination period." *See* Omnibus Budget Reconciliation Act of 1981, Pub. L.

No. 97-35, tit. XXI, § 2146, 95 Stat. 357, 800 (codified as amended at 42 U.S.C. § 1395y(b)(1)(C)).  Originally, the coordination period was 12 months.  During this period—and afterward—ESRD patients "are eligible, but *not required*, to enroll in Medicare Part B."  Office of the Inspector General, Dep't of Health and Human Servs., Advisory Op. No. 13-16, at 2 (Nov. 7, 2013).[3]  And during the coordination period, at least for patients who chose to maintain private insurance, that insurer, not the public fisc, would pay.  The amendments were projected to save the government as much as $180 million per year while ensuring that "no end-stage renal patients [would] be denied needed care or services."  S. Rep. No. 97-139, at 470.

34.     Since 1981, Congress has twice increased the ESRD coordination period, to 18 months in 1990 and to 30 months in 1997.  *See* Omnibus Budget Reconciliation Act of 1990, Pub. L. No. 101-508, tit. IV, § 4203, 104 Stat. 1388, 1388-107; Balanced Budget Act of 1997, Pub. L. No. 105-33, tit. IV, § 4631, 111 Stat. 251, 486.  Consistent with Congress's cost-sharing objective, it was estimated that the 1997 amendments would save the federal fisc an additional $8 billion over 10 years.  *See* H.R. Rep. No. 105-149, at 1405 (1997).

35.     Congress again reaffirmed its commitment to providing ESRD patients access to quality health care and a choice among insurance options in enacting the Affordable Care Act ("ACA").  *See* Pub. L. No. 111-148, 124 Stat. 119 (2010).  A key motivating factor behind the ACA was Congress's concern that insurers were denying coverage to people with pre-existing conditions, including ESRD.  The ACA thus required private insurers to issue plans to eligible enrollees without regard to pre-existing conditions—again, including ESRD.  *See* 42 U.S.C. §§ 300gg-1(a), 300gg-4(a).  The ACA likewise prohibits insurer discrimination on a variety of grounds, including race or disability.  *Id.* § 18116(a).  As a result of

_____

[3] *Available at* https://oig.hhs.gov/fraud/docs/advisoryopinions/2013/AdvOpn13-16.pdf.

these changes in federal law, ESRD patients have greater access to private insurance plans:  Employed ESRD patients can now more easily access employer-sponsored plans, and unemployed ESRD patients can enroll in individual coverage through the marketplaces established by the ACA.

**III.    THE BEST INSURANCE OPTION FOR ESRD PATIENTS VARIES DEPENDING ON INDIVIDUAL NEEDS AND CIRCUMSTANCES**

36.    By congressional design, many ESRD patients have a variety of insurance options available to them—from private insurance offered by an employer or purchased individually, to whole or partial public coverage through federal benefits programs, such as Medicare and Medicaid.  The exact options available to a given patient depend on several factors, including, but not limited to, state of residence, age, and financial status.  The best insurance option for a particular ESRD patient also varies depending on individual circumstances, such as whether the patient suffers from a comorbid disease or (because Medicare covers only the individual, while private insurance may cover the entire family) whether the patient needs a plan that extends to family members.

**A.    Medicare Insurance Options**

37.    Medicare is a federal health insurance program administered by the Center for Medicaid and Medical Services, a component of the U.S. Department of Health and Human Services.  Congress created Medicare in 1965 to provide health insurance to people age 65 or older, regardless of income or medical history.  *See* Social Security Amendment of 1965, Pub. L. No. 89-97, 79 Stat. 286 (codified as amended at 42 U.S.C. § 1395 *et seq*).

38.    Medicare coverage can involve several distinct programs and parts, each with its own applicable premium, deductible, and coinsurance requirements.

39.    Today, Medicare has four parts:  Part A, or Hospital Insurance, covers inpatient medical services.  Part B, or Medical Insurance, covers clinical outpatient services.  Part C, or Medicare Advantage, funds HMO and PPO options

administered by private insurance companies.  And Part D pertains to voluntary prescription drug coverage.  Parts A and B together are often referred to as Traditional or "Original" Medicare.

40.     When Congress originally enacted Medicare in 1965, it did not provide coverage for ESRD for patients under age 65.  At that time, kidney failure was fatal.  Once it became clear that dialysis could treat ESRD patients, lack of insurance became a barrier to treatment.  As described above, Congress responded in 1972 by extending coverage under Medicare to people with ESRD, creating the ESRD coverage system.

41.     To be eligible for Medicare Part B, which covers clinical outpatient services—including dialysis services—an ESRD patient must generally be a U.S. citizen or lawful permanent resident.  *See* 42 U.S.C. § 1395*o*(2).  As a result, a meaningful number of ESRD patients are not eligible for Medicare (and other public insurance options) because they lack lawful immigration status.

42.     Significantly, Congress has never required ESRD patients to enroll in Medicare.  To the contrary, unlike enrollees age 65 or over, ESRD patients under 65 are free to defer enrollment without facing late-enrollment penalties, with certain exceptions.  This is a recognition by Congress that for some ESRD patients, Medicare may not be the best option and that ESRD patients who choose a different health insurance option generally should not be punished with penalties.

43.     Most ESRD patients who choose to receive dialysis in-center become eligible for Medicare coverage on the first day of the fourth month of a patient's dialysis treatments.  During the three-month initial waiting period, patients need alternate coverage.

44.     Medicare supplemental plans, known as "Medigap," provide supplemental coverage for beneficiaries enrolled in both Parts A and B of Medicare.  Medigap plans cover the out-of-pocket expenses—copayments, coinsurance, and deductibles—that the patient must ordinarily pay under Original

1  Medicare.  Medigap plans are not available to ESRD patients under 65 in
2  California.

3         45.    For some ESRD patients and their families, Medicare is not the best
4  insurance option.  For example, due to Medicare's requirement that patients pay
5  20% coinsurance of treatment and other outpatient costs, Medicare-enrolled ESRD
6  patients who do not have Medigap coverage are exposed to substantial out-of-
7  pocket expenses.  For dialysis alone, this could result in $7,000 or more in annual
8  out-of-pocket costs.  In addition, treatment of dialysis patients usually depends on
9  substantial use of drug and biological therapies, and costs for such therapies may
10 exceed an additional $1,000 annually under Medicare.  Many ESRD patients also
11 receive treatment for ESRD comorbidities, such as diabetes, anemia, heart disease,
12 cancer, and hypertension.  ESRD patients have, on average, four comorbidities.
13 Such coinsurance costs thus can add up to thousands of dollars in extra expenses
14 for those patients on Medicare.  Given these significant out-of-pocket costs, private
15 insurance coverage may be better economically for some ESRD patients,
16 especially because coinsurance expenses typically are capped under private
17 insurance.

18        46.    In addition, fewer providers accept Medicare patients than those
19 covered by private insurance, leaving ESRD patients on Medicare with restricted
20 access to certain physicians and specialists.

21        47.    Moreover, dental coverage is typically a prerequisite to kidney
22 transplant eligibility because dental infection threatens the viability of the
23 transplant.  But although most private plans provide access to oral specialists,
24 many Medicare and Medicaid plans do not.

25        48.    Furthermore, Medicare does not cover family members—a matter of
26 particular concern to ESRD patients under 65, as they are more likely to have
27 minor children and Medicare-ineligible dependents than are patients age 65 or
28 older.

**B.     Medicaid Insurance Options**

49.     Medicaid is another federally subsidized insurance plan.  Eligibility for Medicaid is primarily based on income.  ESRD patients thus have no automatic entitlement to Medicaid coverage.

50.     Each State's Medicaid program is administered by that State, and each State individually determines the services Medicaid will cover (subject to federal minimum requirements) and the applicable Medicaid-provider reimbursement rates. Coverage under Medicaid is typically more circumscribed than under Medicare or private insurance.

51.     Medi-Cal is California's Medicaid program.

52.     Medi-Cal is often not the best coverage option even for low-income ESRD patients that do qualify for full benefits.  Because Medi-Cal typically reimburses providers at much lower rates than commercial plans or even Medicare, many providers do not accept Medi-Cal patients, leaving ESRD patients on Medi-Cal with restricted access to certain physicians and specialists.  ESRD patients with commercial coverage have better health outcomes than ESRD patients on Medi-Cal, including lower rates of hospitalization and higher rates of kidney transplantation.

53.     Moreover, due to federal eligibility restrictions, most low-income undocumented adults in California are ineligible for full Medi-Cal benefits, even if they would otherwise qualify based on income, and can instead enroll only in restricted-scope (or emergency) Medi-Cal.  Although restricted-scope Medi-Cal covers dialysis treatment, it does not cover regular doctor visits, hospital care, prescription drugs, and other basic health services.  These limitations are especially significant to ESRD patients who suffer on average from four comorbidities (other medical conditions) such as heart disease or cancer.  Treatment of these comorbidities is essential not only for the patient's overall health but also for a patient to be put on a transplant list.

1

### C.     Commercial Insurance Options

2      54.     Finally, ESRD patients may have various commercial insurance

3    options available to them.

4      55.     Some ESRD patients are covered by an Employer Group Health Plan,

5    either by virtue of the patient's job status or that of his or her spouse or domestic

6    partner.

7      56.     For those patients who are unable to continue working as a result of

8    ESRD, they may be able to continue under their Employer Group Health Plan

9    through COBRA for up to 18 months (or, in some cases, 29 or 36 months).

10     57.     In addition, ESRD patients may obtain private insurance through the

11   ACA.  The ACA established health insurance "Exchanges" or "Marketplaces" to

12   make available to individuals qualifying health insurance plans, called "QHPs."

13   QHPs must provide specified health benefits, and the ACA makes premium and

14   cost-sharing credits available to help individuals and families that meet qualifying

15   income levels to afford the premiums, with limitations.  *See* 45 C.F.R. § 155.340.

16     58.     The ACA offers a limited "Open Enrollment Period" each year,

17   during which time individuals can enroll in QHPs.  California's ACA open

18   enrollment period for 2020 spans from October 15, 2019, through January 31,

19   2020.

20     59.     The ACA afforded ESRD patients broader access to insurance options

21   on the individual health care Exchanges and thus an increased ability to choose

22   private health care coverage instead of Medicare or Medicaid.

23     60.     Access to private insurance options is critical for many ESRD

24   patients.  Many patients receive more robust coverage from commercial insurance

25   than Medicare or Medicaid across multiple dimensions.  Private insurance plans

26   typically offer better integration of medical, prescription, and dental coverage than

27   do government programs.  Original Medicare, for instance, does not cover

28   prescription drugs, and so patients on Original Medicare must find additional (and

costly) coverage for such medications. The same is true for dental work. Private plans, by contrast, often cover these services and charge only one integrated premium for the coverage. Commercial plans often also cover family members, while Medicare does not cover family members unless they are independently eligible. Finally, compared with government insurance, commercial insurance typically offers far better access to and choice of health care providers, especially specialists. As a result, ESRD patients with commercial coverage have better health outcomes, including higher transplant rates, fewer infections, and lower hospitalization rates, than patients with government coverage.

**IV.  AKF'S CHARITABLE PREMIUM ASSISTANCE HAS HELPED ESRD PATIENTS AFFORD HEALTH INSURANCE FOR DECADES AND PLAYS AN IMPORTANT ROLE IN THE ESRD COVERAGE SYSTEM**

61.    Providing dialysis treatment is expensive. Each hemodialysis treatment typically lasts about four hours, must be done at least three times per week, and involves a complex process of removing blood from the body and filtering it through a manufactured membrane called a dialyzer, or artificial kidney, and then returning the filtered blood to the body. The costs of dialysis would be out of reach for most Americans absent some form of health insurance. These costs are especially challenging to the individuals who make up the ESRD population, as they disproportionally have extremely limited means. And even if ESRD patients have insurance coverage—public or private—such programs still carry significant out-of-pocket costs in the form of premiums, coinsurance, and copays, which ESRD patients often cannot fully afford.

62.    In order to ensure that patients with limited financial resources can afford to pay for health insurance essential to obtaining life-sustaining dialysis, charitable organizations—most notably AKF, through its Health Insurance Premium Program ("HIPP")—have provided premium assistance to eligible ESRD

patients since 1997 and direct financial assistance for treatment-related needs since 1971.

63.     AKF provides financial assistance through HIPP to more than 75,000 dialysis patients with ESRD in all 50 states, enabling them to maintain their health insurance coverage.  In 2018, AKF assisted more than 3,700 dialysis patients in California in paying their health insurance premiums (about 5% of the national total of patients assisted by AKF).

64.     AKF's HIPP grants are based on financial need and provide assistance without regard to whether the patient has government or commercial insurance. More than 3,700 dialysis patients in California rely on AKF's charitable assistance grants to help pay for their health insurance—Medicare, Medigap supplemental, employer group health, COBRA, and other plans.  Nationally, the majority of premium assistance that dialysis patients receive from AKF is for help with public insurance coverage.

65.     In California in 2018, more than half of AKF's grants to patients were for Medicare, Medigap, or Medicare Advantage premiums; one third were for employer-provided insurance; and the remaining grants were for private commercial plans, including 8% for ACA Exchange policies.

66.     According to AKF, 68% of the California patients to whom it provides charitable assistance are African American, Hispanic, or Asian.

67.     Charitable premium assistance has long been vitally important to patients who had pre-existing insurance coverage but lost their jobs due to their illness and needed help continuing to pay premiums to maintain coverage once they became ill.

68.     Since the advent of the ACA and the QHPs available on the ACA's health insurance exchanges, premium assistance has also allowed ESRD patients to obtain and maintain beneficial private coverage when it best suits their needs, even if they did not have that coverage before developing ESRD.

69.     AKF's charitable work is supported by donations from more than 61,000 individuals, corporations, and foundations.  Primary among those contributors are dialysis providers.  Providers contribute to AKF because they share AKF's fundamental objectives: ensuring that ESRD patients have access to affordable dialysis treatment (as well as affordable treatment for their other medical conditions) and that ESRD patients have a choice of options to pay for their care, including private insurance and public coverage when patients are eligible for both.  Providers also benefit indirectly from such contributions to the extent that the funding enables AKF to help ESRD patients pay for insurance that makes it possible to obtain treatment for their ESRD, including dialysis.

70.     In 1997, AKF and six unnamed providers obtained from the HHS Office of Inspector General ("OIG") an advisory opinion providing safe harbor standards under which dialysis providers could make contributions to AKF without triggering any analysis of the statutory regime prohibiting providers from providing inducements to patients.  *See* Advisory Opinion No. 97-1, Office of Inspector General, Dep't of Health and Human Services at 5 (1997) ("Op. 97-1").[4] The OIG's Advisory Opinion provides guidance for both AKF and dialysis providers.

71.     To be within the safe harbor identified in the Advisory Opinion, a charity like AKF must be a "bona fide," independent, publicly funded, Section 501(c)(3) organization that awards assistance based on the consistent application of its own independent, financial need-based criteria.  Op. 97-1 at 6.

72.     Moreover, to qualify for the safe harbor under the Advisory Opinion, dialysis providers must not (among other things) earmark contributions for the use

---

[4] *Available at* https://oig.hhs.gov/fraud/docs/advisoryopinions/1997/kdp.pdf. The guidance was not intended as a comprehensive discussion of all possible issues relevant to such an analysis, and would not prevent the parties from raising any defenses relevant to such an analysis in the event the guidance was not followed.

of a particular beneficiary or groups of beneficiaries or consult other providers in determining the amount of its contributions.

73.     The Advisory Opinion is based on the premise that providers "will not disclose directly or indirectly to individual patients … that [the provider] ha[s] contributed to AKF to fund the grants." Op. 97-1 at 4.  That premise was relevant to OIG's conclusion that a patient's receipt of assistance from AKF was not "likely to influence patients to order or receive services from particular providers." *Id.* at 5.

74.     The Advisory Opinion has provided a stable and predictable framework for the provision of charitable premium assistance nationwide to ESRD patients for two decades and has facilitated support to ESRD patients that undoubtedly has saved many lives.

## V.     DIALYSIS PROVIDERS OFFER INDIVIDUALIZED, OBJECTIVE, AND FACT-BASED COUNSELING TO ESRD PATIENTS

75.     Recognizing that ESRD patients face complex health care and treatment decisions that may be difficult for them to navigate given their numerous vulnerabilities, federal law requires that dialysis providers offer fact-based information to patients about many topics, including insurance options.

76.     The Centers for Medicare & Medicaid Services ("CMS") has issued regulations, called the Conditions for Coverage, that require dialysis providers to provide a number of services to these patients above and beyond the dialysis treatment. *See* 42 C.F.R. pt. 494.  For example, clinics must have an interdisciplinary team that provides patients with an "[e]valuation of psychosocial needs." 42 C.F.R. § 494.80(a)(7).  This evaluation must address, among other things, a patient's "[f]inancial capabilities and resources," "[a]ccess to available community resources," and "[e]ligibility for Federal, State or local resources."  U.S.

1    Dep't of Health & Human Servs., Ctr. For Medicare & Medicaid Servs., *ESRD*

2    *Surveyor Training Interpretive Guidance* 193 (2008) ("Surveyor Guidance").[5]

3         77.    In CMS's view, additionally, ESRD "[p]atients' rights" include "the

4    right to be told about any financial help available."  U.S. Dep't of Health & Human

5    Servs., Ctr. For Medicare & Medicaid Servs., *Dialysis Facility Compare: Patients'*

6    *Rights*.[6]  And dialysis clinics must provide "information and help[] patients apply

7    for Medicare, Medicaid and other insurance benefits to assure payment for care."

8    Surveyor Guidance, *supra*, at 271.  Providers have long understood these

9    regulations to require dialysis clinics to provide patients with fact-based, objective

10   information regarding insurance options.

11         78.    Consistent with those requirements, clinic workers and insurance

12   counselors offer patients objective, accurate information that equips each patient to

13   make educated health care choices based on his or her individual circumstances,

14   needs, and preferences.  Clinic teams communicate regularly with ESRD patients

15   about these issues in response to patient needs or queries.  In particular, providers'

16   insurance counselors help patients make informed coverage decisions, including by

17   providing fact-based information and advice regarding Medicare, Medicaid, and

18   private insurance.  This counseling, moreover, is not limited to the initial stages of

19   treatment; instead, social workers and insurance counselors work with patients

20   throughout the time patients receive treatment, including up to kidney

21   transplantation.

22         79.    Patients, of course, are not required to use clinic resources and many

23   patients conduct their own independent research and arrive at an insurance decision

24   without any counseling.  Whether or not patients seek out information from

---

26         [5] *Available at* https://www.cms.gov/Medicare/Provider-Enrollment-and-Certification/GuidanceforLawsAndRegulations/downloads/esrdpgmguidance.pdf.

27
28         [6] *Available at* https://www.medicare.gov/dialysisfacilitycompare/#resources/patient-checklists (visited Nov. 1, 2019).

1   providers regarding the availability and details of various insurance plans,

2   providers believe that the ultimate choice of insurance is for the patient, and the

3   patient alone, to make.  And to that end, each Plaintiff has measures in place to

4   prevent the inappropriate steering of patients onto particular insurance plans.

5   **VI.   PRIVATE INSURANCE PLAYS A CRITICAL ROLE IN THE UNIQUE COVERAGE**

6   **SYSTEM THAT CONGRESS CREATED FOR ESRD PATIENTS**

7       80.   Under the existing ESRD coverage system, dialysis providers are

8   reimbursed for dialysis treatments they provide to ESRD patients in one of two

9   ways: by a government insurer (typically, Medicare or Medicaid/Medi-Cal) or by a

10   private insurer.  As a result of the Medicare entitlement created by Congress,

11   approximately 90% of dialysis patients nationwide are covered by public insurance

12   plans, while only 10% are on private insurance—a ratio much more weighted

13   toward public coverage than that which exists for patients afflicted with other

14   diseases.  The same ratio generally holds true in California.

15       81.   Under Medicare, providers are reimbursed for dialysis treatment

16   according to a schedule set unilaterally by federal regulators.  Providers have no

17   ability to negotiate these rates.  Although Medicare reimbursement provides a

18   relatively predictable and recurring revenue stream, Medicare reimbursement does

19   not cover the full costs of providing dialysis treatment.  The federal Medicare

20   Payment Advisory Commission has estimated that, in 2019, dialysis providers'

21   margins based on Medicare reimbursement rates will be *negative* 0.4%, and even

22   that assessment does not account fully for dialysis providers' costs.  In other words,

23   if Medicare were the only source of reimbursement for dialysis providers, it would

24   not be economically viable for providers to operate their clinics at all—because

25   they would lose money on every dialysis treatment delivered.  For years, dialysis

26   providers have made the inadequacy of Medicare rates known to the federal

27   government.  The rates paid by Medi-Cal for dialysis treatments are even less than

28

1   the Medicare rate, making it even less economically viable for providers in

2   situations where the number of Medi-Cal patients at a clinic is significant.

3          82.    Reimbursement rates for dialysis treatment paid by commercial

4   insurers are, in many, if not most situations, set by contract and are the product of

5   intense negotiation among sophisticated parties.  Insurers have significant leverage

6   in these contractual negotiations, and they often focus intently on reimbursement

7   rate terms.  Because the vast majority of patients with commercial insurance

8   receive dialysis services at in-network facilities, these contractually negotiated

9   reimbursement rates drive the majority of providers' reimbursements for treating

10  patients with such insurance.

11         83.    Providers' contracts with private insurers are typically on multi-year

12  terms, meaning that they cannot easily be renegotiated.  If the number of patients

13  covered by the contracted rate drops, there is no guarantee that providers will be

14  able to negotiate higher rates to make up for any shortfall.

15         84.    In general, the reimbursement rates that private insurers pay for

16  dialysis treatments are higher than the Medicare reimbursement rates.  That is true

17  for many reasons, including the fact that ESRD patients are a comparatively small

18  percentage of an insurer's patient population; the fact that many insurers recognize

19  that the Medicare reimbursement rate is not economically sustainable for dialysis

20  providers; and the fact that insurers recognize the benefit they receive as a result of

21  the federal law creating the ESRD coverage system, as they are often able to hand

22  off "primary payer" responsibility for an ESRD patient to Medicare 30 months

23  after an ESRD patient becomes eligible for Medicare.

24         85.    Because the reimbursement providers receive from public insurance

25  does not even cover the providers' costs, the revenue that dialysis providers receive

26  from private insurers is vital to the financial viability of dialysis providers and their

27  ability to provide care to ESRD patients.

28

86.     Particularly given the fact that the vast majority of ESRD patients have public insurance, many clinics would no longer be financially sustainable and indeed may be forced to close absent the revenue that providers receive from private insurers.  Revenue from private insurers at contractually negotiated reimbursement rates is what enables dialysis providers to operate clinics in an economically viable manner, in the face of low reimbursement rates from Medi-Cal and Medicare, and to continue to invest in new clinics in California—investment that is vital to meeting the rising demand for dialysis treatment and to achieving Congress's goal of ensuring that ESRD patients have access to life-sustaining dialysis treatment.

## VII.  IN ORDER TO TARGET CHARITABLE PREMIUM ASSISTANCE PROVIDED FOR ESRD PATIENTS BY AKF, CALIFORNIA ENACTED AB 290, IMPOSING BURDENSOME REQUIREMENTS ON AKF AND DIALYSIS PROVIDERS

87.     For years, a labor union in California has taken aim at dialysis providers in an effort to organize dialysis workers.  In an attempt to exert pressure on dialysis providers, unions promoted a law passed by the state legislature that, much like AB 290, would have regulated AKF and dialysis providers.  Governor Brown vetoed that statute.  For the same reason, unions also promoted a ballot initiative that would have imposed a draconian cap on dialysis providers' reimbursement rates.  California voters resoundingly rejected that ballot initiative.  AB 290 is the unions' latest gambit.

88.     Passed by the Legislature on September 10, 2019, and signed by the Governor on October 13, 2019, AB 290 destroys the crucial safety net that charitable premium assistance has played for ESRD patients for decades.  AB 290 explicitly targets the "donat[ion] [of] money to a nonprofit"—namely, AKF.  AB 290 Bill Analysis 2 (Sept. 9, 2019).[7]  Indeed, the Legislature fully

_____

[7] *Available at* https://leginfo.legislature.ca.gov/faces/billAnalysisClient.xhtml?bill_id=201920200AB290.

understood—as demonstrated via testimony and public statements—that passing AB 290 would require AKF's departure from California and essentially eliminate charitable premium assistance for ESRD patients in the State.

89.     The Legislature deliberately structured AB 290 to impair AKF's charitable work and to suppress expressive association among ESRD patients, AKF, and health care providers. *See, e.g.*, AB 290 § 1(a) (singling out charitable premium assistance for "end stage renal disease"), § 1(h) (discussing financial contributions to "this nonprofit," that is, AKF), § 1(j) (naming "American Kidney Fund" specifically).[8]

90.     AB 290 accomplishes that outcome by imposing burdensome requirements on entities it labels "financially interested." AB 290 § 3(h)(2). Certain dialysis providers, including Plaintiffs DaVita and FMCNA, are considered "financially interested" simply because of their size, AB 290 § 3(g)(2)(C); other providers are regulated if they "receive[] a direct or indirect benefit from a third-party premium payment," *id.* § 3(g)(2)(A).  In addition, charitable organizations that provide premium assistance to ESRD patients, such as AKF, are considered "financially interested" if they receive a majority of funding from "financially interested providers." *Id.* § 3(h)(2)(B).  Several of AB 290's interrelated provisions are relevant here.[9]

---

[8] AB 290's legislative findings include references to "disorder treatment facilities."  AB 290 § 1(f); *see id.* § 1(a) (referencing "addiction to alcohol or drugs").  Plaintiffs do not challenge AB 290's application to those facilities.  It is clear from the events leading up to the enactment of AB 290, however, that the law was driven in significant part by efforts to target AKF, dialysis providers, and AKF's assistance to ESRD patients. *See, e.g.*, Assemblymember Jim Wood, Press Release, *Assemblymember Jim Wood Introduces AB 290 To Prevent Dialysis Companies From Scamming The Health System*, https://a02.asmdc.org/press-releases/20190128-asm-jim-wood-introduces-ab-290-prevent-dialysis-companies-scamming-health (Jan. 28, 2019) (discussing AKF and dialysis providers).

[9] AB 290 amends state law regulating "chronic dialysis clinic[s]," "health care service plans," and "health insurers."  Under preexisting California law, a

91.     First, AB 290 compels AKF to disclose to private insurance companies the identities of patients receiving charitable premium assistance. AB 290 § 3(c)(2) ("Patient Disclosure Mandate").  This is private information that ESRD patients may want to keep confidential—for instance, out of concern that this disclosure would put them at risk of losing insurance coverage if they leave California.  For this reason, AKF should not be compelled to provide this information, which would eliminate a patient's ability to keep such information confidential.

92.     Second, AB 290 penalizes certain providers for making financial contributions to AKF or other providers of premium assistance.  If a patient receives charitable premium assistance from AKF to pay the patient's private insurance premiums, a provider that does not make contributions to AKF is entitled to receive its full negotiated reimbursement rate from that private insurer.  If the provider exercises its First Amendment right to contribute to AKF and does not qualify for limited statutory exemptions, however, AB 290 caps the provider's reimbursement rate for dialysis treatment at the Medicare reimbursement rate.  *See* AB 290 § 3(e)(1) ("Reimbursement Penalty").  A provider who contributes to AKF can avoid the Reimbursement Penalty, if at all, only by initiating an arbitration process.  *Id.* § 3(e)(1), (f).

---

"chronic dialysis clinic" is a "clinic that provides less than 24-hour care for the treatment of patients with end-stage renal disease, including renal dialysis services," and is subject to various licensing requirements and regulations.  Cal. Health & Safety Code § 1204(b)(2).  A "[h]ealth care service plan" is effectively a managed care plan or HMO.  *See* Cal. Health & Safety Code § 1345(f).  Health care service plans are regulated by the Department of Managed Health Care.  Also under preexisting California law, "insurers," including health insurers, are regulated by the California Insurance Code, which is administered by the Department of Insurance.  The law imposes parallel changes under the California Health and Safety Code (regulating health care service plans), *see* AB 290 §§ 3-4, and the California Insurance Code (regulating insurance plans), *see* AB 290 §§ 5-6.  For ease of reference, the Complaint cites only §§ 3-4, not §§ 5-6.

93.     Third, AB 290 prohibits chronic dialysis clinics, including those owned or operated by Plaintiffs, from "steer[ing], direct[ing], or advis[ing] a patient regarding any specific coverage program option or health care service plan contract."  AB 290 § 2(a).[10]  The provision does not define the terms "steer," "direct," or "advise."  Violation of this restriction can subject the provider to criminal liability or the threat of clinic closure.  Cal. Health & Safety Code §§ 1235-1238, 1240-1245.  The law bans only certain speech by certain speakers; other parties, including commercial insurers and the government, are permitted to "steer," "direct," or "advise" patients towards or away from any specific coverage program option or health care service plan contract without limitation.

94.     Fourth, AB 290 creates a penalty for non-compliance with certain disclosure requirements, including the Patient Disclosure Mandate.  Specifically, if an insurer "discovers that a financially interested entity fails to provide" required "disclosure[s]," then the insurer "shall be entitled to recover 120 percent of the difference between a payment made to a provider and the payment to which the provider would have been entitled pursuant to [the Reimbursement Penalty], including interest on that difference."  AB 290 § 3(i).  That provision on its face accordingly imposes financial penalties on dialysis providers based on whether AKF makes required patient disclosures to insurers—and regardless of whether that non-disclosure was intentional or inadvertent.

95.     While AB 290 was pending in the Legislature, AKF publicly stated and testified that it would be unable to remain in the State were the bill enacted, given the conflict it sees between AB 290 and Advisory Opinion 97-1.  Rather than address the source of the conflict AKF sees between AB 290 and that guidance, the

---

[10] Section 2 also requires dialysis clinics to "post a notice" stating that "questions about Medicare coverage for patients with [ESRD] should be directed to the Health Insurance Counseling and Advocacy Program or HICAP at 1-800-434-0222."  AB 290 § 2(b).  Plaintiffs do not challenge this requirement in this litigation.

Legislature amended AB 290 to compel AKF or others to petition HHS OIG for a new, "updated" advisory opinion.  The amendment delays AB 290's effective dates—but if, and only if, AKF, or another "entit[y] covered by" Advisory Opinion 97-1, "request[ed] an updated opinion" from federal regulators by July 1, 2020.  AB 290 § 7.  Absent such a request, many of AB 290's burdensome requirements will be imposed on AKF as of that date.  *Id.*  Although AKF made clear while the amended bill was still pending that it could not request a new opinion from HHS OIG under federal law, the Legislature nonetheless passed the bill.

96.     Other provisions of AB 290 go into effect at different times.  Section 2, which bars dialysis clinics from "steer[ing], direct[ing], [and] advis[ing] a patient" regarding insurance coverage and requires clinics to post a notice directing patients to a state helpline, takes effect on January 1, 2020.  The Reimbursement Penalty becomes operative on January 1, 2022.  AB 290 §§ 3(e), 5(e).

**VIII.  BY REMOVING THE SAFETY NET PROVIDED BY CHARITABLE PREMIUM ASSISTANCE, AB 290 WILL CAUSE A DIALYSIS CARE CRISIS IN CALIFORNIA, IRREPARABLY INJURING PLAINTIFFS AND SERIOUSLY IMPAIRING THE PUBLIC INTEREST**

97.     If permitted to take effect, AB 290 will force AKF to shutter operations and precipitate a health care crisis in California, inflicting significant and irreparable damage on the public interest and on Plaintiffs.

98.     Unless AB 290 is enjoined, AKF has indicated that the conflict it identified to the Legislature will force it to cease operations in California, depriving California ESRD patients of the primary source of charitable premium assistance in the State.  Indeed, even California's Legislative Counsel has conceded a conflict between AB 290 and Advisory Opinion 97-1, acknowledging that the opinion "would not ensure that the version of the patient assistance program operated by AKF in compliance with AB 290 would be immune from

1    OIG sanctions."  As a result of that conflict, as well as other material changes to

2    AKF's operations that would be compelled by AB 290, AKF has stated

3    unequivocally that it will cease operations in the State unless the law is enjoined.

4         99.     By compelling AKF to cease operations in California, AB 290 will

5    deprive many patients in this State—including patients of Plaintiffs on whose

6    behalf Plaintiffs have brought this action—of their ability to pay for their insurance

7    coverage.  This applies to Plaintiffs' patients who currently receive AKF assistance

8    to pay for commercial insurance (and who therefore will be forced to switch to

9    public options that may not be in their best interest) and Plaintiffs' patients who

10   use AKF assistance to help cover the costs of their public coverage (and who may

11   have no coverage at all after AKF's departure).  Either outcome will result in

12   irreparable injury.  Patients compelled to shift to public insurance may face

13   significantly higher out-of-pocket costs and worse health care outcomes.  Although

14   public insurance may be better for some ESRD patients, it can be significantly

15   worse for many others, in terms of economic cost as well as access to quality care

16   and kidney transplants.  And some patients are not eligible for public coverage at

17   all.  Those harms cannot be remedied after the fact and are thus irreparable—

18   particularly given that they result from AB 290's deprivation of patients' choice of

19   insurance.

20        100.   Moreover, some ESRD patients, including Plaintiffs' patients, do not

21   qualify for Medicare or Medi-Cal, and Medicare does not cover family members.

22   Some AKF-assisted patients and their family members who currently have private

23   insurance but are ineligible for public options will therefore lose insurance

24   coverage altogether as a result of AB 290.  And other patients who use assistance

25   to pay for Medicare or Medigap may likewise lose insurance as a result of AB 290.

26   The loss of insurance undoubtedly constitutes irreparable injury.  In addition, by

27   forcing many ESRD patients currently receiving charitable premium assistance to

28   change insurance options, AB 290 may jeopardize those patients' access to life-

1    saving kidney transplants by knocking those patients off kidney transplant lists.

2    Finally, Plaintiffs' patients will face irreparable injury to the extent that providers

3    are forced to curtail providing needed and valuable counseling regarding insurance

4    options to ESRD patients for fear of liability under § 2.  That harm—which will

5    affect access to care regardless of whether an ESRD patient has private or public

6    insurance—is significant, and it is irreparable as it will directly affect patient

7    access to quality care as well as patient health.  For all of those reasons, Plaintiffs'

8    patients face irreparable injury if AB 290 goes into effect.

9         101.   AB 290 also will inflict irreparable harm on Plaintiffs themselves.  As

10   an initial matter, AB 290 violates Plaintiffs' First Amendment rights, and "[t]he

11   loss of First Amendment freedoms, for even minimal periods of time,

12   unquestionably constitutes irreparable injury."  *Valle Del Sol Inc. v. Whiting*, 709

13   F.3d 808, 828 (9th Cir. 2013) (quoting *Elrod v. Burns*, 427 U.S. 347, 373 (1976)).

14   In addition, as of January 1, 2020, AB 290 will inflict irreparable, unrecoverable

15   economic harm on Plaintiffs.  By compelling AKF to cease operations in

16   California, AB 290 will undermine the economic viability of many dialysis clinics

17   in California—risking clinic closures, decreased investment in new clinics in the

18   State, or both.  Effects such as those, of course, also will inflict irreparable harm on

19   patients, due to the reduction in their access to needed health care.

20        102.   Even absent clinic closures, Plaintiffs will suffer lost revenues as a

21   result of patients shifting to public insurance or losing insurance altogether in the

22   wake of AKF's forced departure from California.  These economic injuries are

23   irreparable because Plaintiffs would have no remedy to recover for these injuries

24   from Defendants.

25        103.   As a result of the predictable harms that AB 290 is certain to inflict,

26   the legislation was opposed by a staggeringly diverse and wide coalition of doctor,

27   patient, and civil rights organizations, including the California Medical Association,

28   California Hospital Association, California State Conference NAACP, Renal

1    Physicians Association, National Veterans Foundation, National Hispanic Medical

2    Association, National Medical Association, California Black Chamber of

3    Commerce, Orange County Business Council, and Orange County Medical

4    Association.  Many of these organizations testified before the Legislature that their

5    members and communities would suffer deep damage from AB 290.

6    **IX.   PLAINTIFFS HAVE STANDING TO CHALLENGE AB 290**

7         104.   Plaintiffs have standing to bring this action, as each Plaintiff has

8    suffered or imminently will suffer a redressable injury caused by the enactment,

9    administration, or implementation of AB 290.

10        105.   Plaintiffs are or will be injured directly by AB 290 in multiple

11   respects, including because AB 290 imposes a financial penalty on so-called

12   financially interested providers for engaging in the expressive act of financially

13   supporting AKF (§§ 3(e), 5(e)), purports to override contracts negotiated by

14   providers with insurers (§§ 3(e), 5(e)), and restricts all dialysis providers' protected

15   speech to their patients (§ 2).  These injuries, to the extent they are not being

16   suffered presently, are certainly impending.

17        106.   In addition, AB 290 imminently will harm Plaintiffs and their patients

18   by compelling AKF to cease operations in California, which will reduce or

19   eliminate the availability of charitable premium assistance for California dialysis

20   patients and, in turn, cause many to lose their preferred health insurance or become

21   completely uninsured.  That is an obvious harm to Plaintiffs' patients, whose

22   access to life-preserving health care will be put at risk, and it also will harm

23   providers, whose financial well-being depends on the reimbursement they receive

24   for providing care to patients.

25        107.   Defendants' impending enforcement of AB 290 is a substantial factor

26   motivating AKF's decision to terminate its California operations—indeed, there is

27   nothing to indicate that AKF would have left the state if AB 290 had not been

28   passed—and AKF's ceasing to provide premium assistance undoubtedly will make

1  it more difficult, and in some cases impossible, for patients to afford health

2  insurance.  Thus, the injuries to Plaintiffs and Plaintiffs' patients caused by AKF's

3  departure from California are certainly impending and fairly traceable to

4  Defendants' enactment and imminent enforcement of AB 290.

5       108.    The financial injuries that AB 290 will inflict on Plaintiffs also will

6  cause an independent injury to their patients, because providers will be forced to

7  reduce services and potentially close some dialysis clinics, without building new

8  ones—thereby further threatening the patients' access to care.

9       109.   Plaintiffs have standing to assert legal claims on behalf of their ESRD

10 patients.  Plaintiffs have suffered or imminently will suffer injury caused by the

11 AB 290, as described above.  And as health care providers, Plaintiffs have a

12 sufficiently close relationship with their ESRD patients to assert claims on the

13 patients' behalf.  Finally, many of Plaintiffs' ESRD patients face multiple obstacles

14 to bringing suits on their own behalf, including privacy concerns and

15 understanding the complex regulatory scheme enacted by AB 290.

16      110.   Enjoining and invalidating AB 290 would redress the injuries to

17 Plaintiffs and their patients.

18                  **FIRST CLAIM FOR RELIEF**

19  **First and Fourteenth Amendments, U.S. Constitution; 42 U.S.C. § 1983**

20      111.   Plaintiffs incorporate the foregoing paragraphs as if fully set forth

21 herein.

22      112.   AB 290 imposes an array of burdens on the First Amendment-

23 protected speech and associational activity of Plaintiffs and their patients.  These

24 burdens, moreover, cannot satisfy any conceivably applicable level of heightened

25 First Amendment scrutiny.  AB 290's speech restrictions also implicate Plaintiffs'

26 due process rights under the Fourteenth Amendment.

27      113.   First, AB 290's Patient Disclosure Mandate and related

28 Reimbursement Penalty burden First Amendment expressive and associational

interests of providers and ESRD patients, among others.  By compelling the disclosure of the identity of patients receiving charitable assistance—and, by implication, the patients' financial means—the Patient Disclosure Mandate would deter ESRD patients from associating with AKF and would penalize patients for that association.  That is because many ESRD patients receiving charitable assistance want that private information kept confidential, and not disclosed to insurance companies.

114.   In addition, certain Plaintiffs engage in First Amendment-protected activity by contributing financial resources to AKF in furtherance of its charitable mission.  AB 290, in purpose and effect, targets and burdens that expressive activity by penalizing these Plaintiffs for making financial contributions to, and maintaining relationships with, charitable organizations like AKF.

115.   Because AB 290 targets a small number of First Amendment actors—AKF and Plaintiffs—the law is subject to particularly exacting First Amendment review.

116.   To the extent that the Patient Disclosure Mandate imposes compelled speech obligations on AKF, the provision is a content-based speech mandate that triggers heightened review.

117.   The Patient Disclosure Mandate and Reimbursement Penalty cannot survive heightened First Amendment review.  Those provisions do not directly or materially advance a compelling state interest and they burden substantially more speech or associational activity than necessary to further any legitimate interest.  The stated justifications for AB 290—preventing steering and reducing insurance premiums—are factually unsupported and no provision of AB 290 is structured to reduce insurance premiums that patients pay.  In addition, the State had numerous alternatives to addressing any concerns short of burdening First Amendment activity, including through targeted anti-steering restrictions or rate regulation of insurance premiums.

118.   Second, AB 290 independently violates the First and Fourteenth Amendments because § 2 unduly restricts Plaintiffs' speech.  To begin with, § 2's restriction on Plaintiffs' "advis[ing]" ESRD patients "regarding any specific coverage program option or health care service plan contract" is unconstitutionally vague.  The law—a violation of which may subject providers to criminal penalties—does not provide fair notice as to whether a provider "advise[s] a patient regarding any specific coverage program option" when the provider offers to patients objective, fact-based information about their public and private coverage options.  Because Plaintiffs will be unable to determine the point at which their impartial provision of accurate, objective information to ESRD patients crosses the line into forbidden "advi[ce] … regarding" coverage options, the speech restrictions are void for vagueness.

119.   Further, if § 2 is read to apply to the impartial provision by health care providers of factual information to their patients, § 2's advice restriction violates the First Amendment.  Section 2 is plainly content-based and speaker-based, factors that demand strict scrutiny.  But even under intermediate scrutiny, § 2's restriction on providing patients accurate, objective information about insurance options would not pass constitutional muster.  Among other things, there is no evidence that steering is a genuine problem, and, in any event, the State had available to it less burdensome alternatives, including more narrowly targeted anti-steering prohibitions.

120.   Third, § 7 compels certain Plaintiffs to forego their own advocacy priorities and instead press California's agenda before the federal HHS Office of Inspector General, thereby "abridging" those Plaintiffs' First Amendment "right … to petition the Government for a redress of grievances."  This attempt to compel these Plaintiffs to exercise their petitioning rights and to do so in a particular manner—asking OIG for an "updated opinion"—triggers First Amendment review and fails that review because the State has no compelling interest in coercing these

1    Plaintiffs to take steps to save the legitimacy of the Patient Disclosure Mandate and

2    Reimbursement Penalty.

3       121.   Finally, AB 290 is fatally overbroad, as it contains a number of

4    broadly defined or undefined terms that could chill First Amendment speech from

5    a wide range of persons.  Those terms include, but are not limited to, "financially

6    interested" and "financial relationship."  Faced with potential criminal penalties

7    under the law, health care providers or others who are unsure whether they qualify

8    as "financially interested" or as having a "financial relationship" with a charity

9    within the meaning of AB 290 might reasonably "choose simply to abstain from

10   protected speech, harming not only themselves but society as a whole."  *Virginia v.*

11   *Hicks*, 539 U.S. 113, 119 (2003).  Because it thereby chills a substantial quantum

12   of speech, as "judged in relation to [its] plainly legitimate sweep," AB 290 must be

13   invalidated in full.  *Id.* at 118-19.

14      122.   AB 290's constitutional violations taint the law as a whole, requiring

15   its total invalidation as applied to Plaintiffs and their patients.  At the very least,

16   these violations require severance of the offending provisions.

17      123.   These injuries and constitutional deprivations are directly and

18   proximately caused by the actions of Defendants and their employees, in their

19   capacity as government agents, and are the product of a policy or custom of the

20   State of California.

21      124.   Plaintiffs are entitled to declaratory and injunctive relief to remedy

22   Defendants' threatened and imminent violations of the First Amendment.  Absent

23   such relief, Plaintiffs and their patients will suffer irreparable harm.

### SECOND CLAIM FOR RELIEF

### Supremacy Clause, U.S. Constitution

26      125.   Plaintiffs incorporate the foregoing paragraphs as if fully set forth

27   herein.

28

126.   Under the Supremacy Clause, "the Laws of the United States" are "the supreme Law of the land … any Thing in the Constitution or Laws of any State to the contrary notwithstanding."  U.S. Const. art. IV, cl. 2.  The Supremacy Clause voids state laws that interfere with "the accomplishment and execution of the full purpose and objectives of Congress."  *Oneok, Inc. v. Learjet, Inc.*, 135 S. Ct. 1591, 1595 (2015) (quotation marks omitted).  In addition, "[p]reemption occurs where it is impossible for a private party to comply with both state and federal law."  *Credit Suisse First Boston Corp. v. Grunwald*, 400 F.3d 1119, 1132-1133 (9th Cir. 2005) (quotation marks omitted).

127.   Section 2 bars providers from "advis[ing]" patients "regarding any specific" insurance options.  To the extent that provision bars providers from providing ESRD patients with objective, fact-based education about insurance options, it puts providers in a Catch-22 because federal law requires them to provide information about insurance options.

128.   Under federal law, dialysis providers must provide patients with information about "[f]inancial capabilities and resources," "[a]ccess to available community resources," and "[e]ligibility for Federal, State or local resources," and likewise must provide "information and help[] patients apply for Medicare, Medicaid and other insurance benefits to assure payment for care."  Surveyor Guidance, *supra*.

129.   By prohibiting providers (on pain of criminal sanction) from advising ESRD patients about options that federal law requires them to discuss, AB 290 makes it impossible for providers to comply with both state and federal law.

130.   Independently, AB 290 interferes with, frustrates, and stands as an obstacle to the accomplishment of the objectives and purposes of Congress.  By taking aim at a crucial safety net for ESRD patients provided by AKF and by forcing AKF to shutter operations in California, AB 290 disrupts the careful balance struck by federal law in ensuring ESRD patient access to quality care,

protecting patient choice in insurance options, and safeguarding the stability of the dialysis system by spreading the high costs of providing dialysis treatment.  AB 290 conflicts with Congress's scheme for many reasons, including:

131.   First, restricting patient choice in insurance options is a direct affront to Congress's repeated efforts to "afford [ESRD] patients the opportunity to elect [insurance] coverage that best serves their needs."  *Dialysis Patient Citizens*, 2017 WL 365271, at *1.  AB 290 frustrates Congress's efforts to preserve patient choice in health insurance operations with respect to ESRD patients who can afford insurance (whether private or public) only through charitable assistance.

132.   Second, by forcing ESRD patients from commercial coverage to Medicare or Medi-Cal, AB 290 runs contrary to congressional efforts to ensure that private insurers pay part of the costs of providing dialysis treatment.  Congress enacted the Medicare Secondary Payer Act to cut Medicare costs.  Congress created the ESRD coordination period specifically to relieve the strain on Medicare from ESRD patients.  Likewise, Congress specifically declined to mandate that ESRD patients obtain Medicare coverage, even after the coordination period.  AB 290 frustrates those legislative choices:  By directly targeting assistance ESRD patients rely upon to pay for commercial coverage, AB 290 will prematurely force ESRD patients off commercial health insurance and onto Medicare, countermanding Congress's goal of shifting costs from the Medicare program to private health insurers.

133.   Third, impairing ESRD patient access to quality health care conflicts with longstanding congressional objectives.  Congress has long sought to ensure access to health care for ESRD patients.  By causing ESRD patients who previously received premium assistance to shift to public health insurance, AB 290 will reduce the revenue received by dialysis clinics and thereby will risk clinic closures or decreased investment in clinics throughout California.  By impairing incentives to invest in new clinics or by causing clinic closures, AB 290 will cause

an ESRD care crisis in California—an outcome directly contrary to federal objectives.  ESRD patients are typically poor and have less access to convenient transportation to reach clinics farther away.  Because dialysis is required multiple times a week and because even one missed treatment can lead to death, the consequences of decreased access to clinics for all ESRD patients in California—not just those who receive charitable assistance or who are currently on private insurance—will be life-threatening.  These injuries to patients will exacerbate racial inequality in access to care, frustrating congressional objectives.

134.   Relatedly, AB 290 will significantly impair incentives to invest in new dialysis facilities in California.  To address the increasing rates of ESRD incidence in California, approximately 350 additional clinics will be needed over the next decade.  AB 290 will blunt incentives to invest, resulting in reduced access to care for ESRD patients—a result contrary to federal policy objectives.

135.   Each of the above conflicts between AB 290 and federal objectives is direct and deliberate, not incidental.  AKF's departure from California in light of AB 290 was a direct and foreseeable result of AB 290's enactment.  Indeed, AKF told the Legislature unequivocally that the law's burdens would force AKF to cease operations in the State.  And the Legislature's own legal analysis acknowledged that AB 290 would undermine AKF's ability to rely on OIG's guidance.  Rather than address those concerns directly, the Legislature added § 7 to AB 290 in an attempt to coerce AKF or certain providers into asking HHS OIG for an updated advisory opinion blessing the new arrangement mandated by AB 290.  But having structured its charitable program on the basis of OIG's longstanding guidance, AKF is understandably unwilling to jeopardize any disruption to its life-saving work in the other 49 states.  California knew of these concerns, but enacted AB 290, including § 7, regardless.

136.   Plaintiffs are entitled to declaratory and injunctive relief to remedy Defendants' threatened and imminent violations of the federal Constitution and laws.  Absent such relief, Plaintiffs and their patients will suffer irreparable harm.

### THIRD CLAIM FOR RELIEF

### Contracts Clause, U.S. Constitution; 42 U.S.C. § 1983

137.   Plaintiffs incorporate the foregoing paragraphs as if fully set forth herein.

138.   The U.S. Constitution's Contracts Clause forbids states from "pass[ing] any … Law impairing the Obligations of Contracts[.]"  U.S. Const. art I. § 10, cl. 1.

139.   A state law violates this provision when "the state law … 'operate[s] as a substantial impairment of a contractual relationship,'" *Sveen v. Melin*, 138 S. Ct. 1815, 1821-22 (2018), and "the state law is [not] drawn in an 'appropriate' and 'reasonable' way to advance 'a significant and legitimate public purpose,'"  *id.* at 1822.  As applied to preexisting contracts between providers and insurers, AB 290 violates the Contracts Clause.

140.   To the extent that AB 290 applies to contractual relationships entered into prior to the law's effective date, AB 290 operates as a substantial impairment of Plaintiffs' existing contractual relationships because, among other things:

      a)   The reimbursement terms in existing contracts are critical contractual terms, and they are heavily negotiated.

      b)   When negotiating with private insurers, providers have reached agreements on rates higher than the Medicare rate.

      c)   AB 290 does not advance, but frustrates, the clear intent of the contracting parties.

      d)   AB 290 does not supply a default rule, but rather imposes mandatory terms that displace those in existing contracts.

141.   AB 290's arbitration provisions do not mitigate this impairment because, among other things, the process appears designed to treat the below-cost Medicare reimbursement as a default rate and the costs and burdens of arbitration may well render the procedure an insufficient means to remedy AB 290's impairment of existing contractual rights.

142.   AB 290 is not drawn in an appropriate or reasonable way to advance a significant and legitimate State purpose.  That is so for multiple reasons, including:

    a)    AB 290 directly and explicitly was enacted in order to interfere with contracts and thus does not do so only incidentally.

    b)    AB 290's substantial contractual interference is unexpected, because California has never before regulated reimbursement rates between dialysis providers and private insurers.

    c)    AB 290 alters contractual duties among a narrow class of private parties rather than setting out a generally applicable rule of conduct designed to advance a broad societal interest. Indeed, the law systematically imposes a detriment on one contracting party (providers), to the direct benefit of the other (insurers).

    d)    Regardless of the significance or legitimacy of a State's interest in reducing insurance premiums for consumers, AB 290 is not narrowly tailored to achieve that goal, including because the law imposes no requirement on insurers to pass along financial savings to consumers.  The financial benefits of the law inure to insurance companies, not to consumers.

    e)    California could have achieved its stated goal of reducing insurance costs for consumers in other ways, including by regulating directly the rates charged by insurers.

143.   These injuries and constitutional deprivations are directly and proximately caused by the actions of Defendants and their employees, in their capacity as government agents, and are the product of a policy or custom of the State of California.

144.   Plaintiffs are entitled to declaratory and injunctive relief to remedy Defendants' threatened violations of the Contracts Clause.  Absent such relief, Plaintiffs will suffer irreparable harm.

### FOURTH CLAIM FOR RELIEF

### Due Process Clause, U.S. Constitution; 42 U.S.C. § 1983

145.   Plaintiffs incorporate the foregoing paragraphs as if fully set forth herein.

146.   The Fourteenth Amendment provides that "no person shall … be deprived of life, liberty, or property, without due process of law."  In addition to "fair process," the Due Process Clause "provides heightened protection against government interference with certain fundamental rights."  *Washington v. Glucksberg*, 521 U.S. 702, 719 (1997).  AB 290—a death sentence for some of Plaintiffs' ESRD patients—violates those rights.

147.   After AB 290 goes into effect, many ESRD patients who lose charitable premium assistance—including Plaintiffs' patients—will be unable to afford health insurance.  Some lack the work credits required for Medicare eligibility, or do not satisfy the citizenship requirement.  Some of those who are eligible will not receive reimbursement for the first three months of their dialysis treatment, and may not be able to cover the cost of their ongoing treatment after those three months, as Medicare—unlike individual plans—has no out-of-pocket spending cap and requires patients to pay a large percentage of prescription drug costs.  Those who need kidney transplants may simply be out of luck: Some government plans do not pay for live transplant surgery (which has the highest success rate), while some transplant centers do not accept government insurance.

1    Plaintiffs' ESRD patients who lose access to dialysis treatment, or who cannot

2    receive the kidney transplant they need, will be forced to forgo care, will be taken

3    to the emergency room intermittently as their condition worsens, and, eventually,

4    will die.

5        148.   ESRD patients who do not qualify for Medicare are not the only ones

6    whose lives AB 290 puts at risk.  Because most ESRD patients have government

7    insurance, which does not reimburse providers at a rate that covers the cost of

8    dialysis treatment, many dialysis clinics could not stay open without at least some

9    patients with private insurance.  AB 290 upsets this delicate balance, either by

10   stripping patients of any insurance option or by forcing them into government

11   insurance plans that do not pay enough to dialysis clinics to keep their doors open.

12   As a result, California will almost certainly experience a provider shortage.

13   Particularly in rural areas where few clinics operate, some ESRD patients will lose

14   access to care altogether.  If a patient cannot access care, it does not matter if she is

15   insured.  She, too, will ultimately die of kidney failure.

16       149.   By interfering with ESRD patients' ability to access the care they

17   need, AB 290 "interpos[es] itself between a terminally ill patient and her only

18   means of prolonging her life," violating "the common law's historical prohibition

19   on interfering with rescue"—a prohibition "firmly grounded" in our Nation's

20   "history and tradition." *Abigail All. for Better Access to Developmental Drugs v.*

21   *von Eschenbach*, 495 F.3d 695, 718 (D.C. Cir. 2007) (Rogers, J., dissenting).

22   California has failed to identify any compelling state interest that would warrant

23   limiting this fundamental right to lifesaving treatment.

24       150.   These injuries and constitutional deprivations are directly and

25   proximately caused by the actions of Defendants and their employees, in their

26   capacity as government agents, and are the product of a policy or custom of the

27   State of California.

28

151.   On behalf of their patients, Plaintiffs are entitled to declaratory and injunctive relief to remedy Defendants' threatened and imminent violations of the Due Process Clause.  Absent such relief, Plaintiffs' patients will suffer irreparable harm.

## FIFTH CLAIM FOR RELIEF

### Takings Clause, U.S. Constitution; 42 U.S.C. § 1983

152.   Plaintiffs incorporate the foregoing paragraphs as if fully set forth herein.

153.   "The Takings Clause of the Fifth Amendment, applicable to the States through the Fourteenth Amendment, prohibits the government from taking private property for public use without just compensation." *Palazzolo v. Rhode Island*, 533 U.S. 606, 617 (2001) (citation omitted).

154.   AB 290's Reimbursement Penalty violates the Takings Clause because it takes the property of regulated dialysis providers without public use and just compensation by:

a)   Denying dialysis providers all economically beneficial or productive use of certain clinics;

b)   Requiring dialysis providers, in some circumstances, to return to insurers a defined portion of funds previously paid by insurers to those providers and which those providers otherwise would be entitled to keep under contracts they entered with those insurers;

c)   Interfering with investment-backed expectations regarding reimbursement for dialysis treatment and imposing significant economic losses on those providers.

155.   These injuries and constitutional deprivations are directly and proximately caused by the actions of Defendants and their employees, in their

1  capacity as government agents, and are the product of a policy or custom of the

2  State of California.

3      156.   Plaintiffs are entitled to declaratory and injunctive relief to remedy

4  Defendants' threatened violations of the Takings Clause.  Absent such relief,

5  Plaintiffs will suffer irreparable harm.

6                    **SIXTH CLAIM FOR RELIEF**

7      **Due Process Clause, U.S. Constitution; 42 U.S.C. § 1983**

8      157.   Plaintiffs incorporate the foregoing paragraphs as if fully set forth

9  herein.

10      158.   The Due Process Clause is violated where a person is penalized for

11  the independent acts of others and for conduct over which the person had no ability

12  to control.

13      159.   AB 290 violates that constitutional restraint on governmental power.

14  AB 290 provides that, where a "financially interested entity" fails to disclose to an

15  insurer the name of a patient receiving charitable assistance, the insurer "shall be

16  entitled to recover 120 percent of the difference between a payment made to a

17  provider and the payment to which the provider would have been entitled" under

18  AB 290 if disclosure had been made.  AB 290 § 3(i).

19      160.   To the extent that provision of AB 290 means that Plaintiffs must pay

20  financial penalties if AKF fails to make a compelled disclosure under the Patient

21  Disclosure Mandate, that would violate the Due Process Clause by penalizing

22  Plaintiffs for independent acts of AKF over which they have no control.

23      161.   These injuries and constitutional deprivations are directly and

24  proximately caused by the actions of Defendants and their employees, in their

25  capacity as government agents, and are the product of a policy or custom of the

26  State of California.

27

28

162.   Plaintiffs are entitled to declaratory and injunctive relief to remedy Defendants' threatened violations of the Due Process Clause.  Absent such relief, Plaintiffs will suffer irreparable harm.

### **PRAYER FOR RELIEF**

Wherefore, Plaintiffs respectfully request that the Court:

1.   Expedite these proceedings pursuant to Federal Rule of Civil Procedure 57, which authorizes courts to "order a speedy hearing" in a case seeking a declaratory judgment;

2.   Declare that AB 290 is unconstitutional—facially or in part, as applied to some or all of Plaintiffs and their patients, or both;

3.   Grant preliminary and permanent injunctive relief barring Defendants from enforcing AB 290—facially or in part, as applied to some or all of the Plaintiffs and their patients, or both;

4.   Award Plaintiffs their costs and reasonable attorney's fees as appropriate; and

5.   Grant such further relief as this Court deems just and proper.

Dated:       November 5, 2019            Respectfully submitted,

/s/ Kelsi Corkran                                 /s/ David W. Ogden
KELSI CORKRAN*                          DAVID W. OGDEN*
kcorkran@orrick.com                      David.Ogden@wilmerhale.com
ORRICK HERRINGTON &              KELLY P. DUNBAR*
   SUTCLIFFE LLP                          Kelly.Dunbar@wilmerhale.com
1152 15th Street NW                        ARI HOLTZBLATT*
Washington, DC 20005                    Ari.Holtzblatt@wilmerhale.com
Telephone:   (202) 339-8497          ALEX HEMMER*
Facsimile:    (202) 339-8500          Alex.Hemmer@wilmerhale.com
                                                        ARIN SMITH*
RACHEL G. SHALEV*                    Arin.Smith@wilmerhale.com
rshalev@orrick.com                        WILMER CUTLER PICKERING
ORRICK HERRINGTON &                 HALE AND DORR LLP
   SUTCLIFFE LLP                          1875 Pennsylvania Avenue NW

51 West 52nd Street
New York, NY 10019
Telephone:    (212) 506-5000
Facsimile:     (212) 506-5151

KORY DECLARK (SBN 310571)
kdeclark@orrick.com
ORRICK HERRINGTON &
     SUTCLIFFE LLP
405 Howard Street
San Francisco, CA 94105
Telephone:    (415) 773-5727
Facsimile:     (415) 773-5759

/s/ Glenn D. Dassoff
GLENN D. DASSOFF (SBN 96809)
gdassoff@orrick.com
ABIGAIL W. LLOYD (SBN 243971)
alloyd@orrick.com
ORRICK HERRINGTON &
     SUTCLIFFE LLP
2050 Main Street, Suite 1100
Irvine, CA 92614
Telephone:    (949) 567-6700
Facsimile:     (949) 567-6710

***Attorneys for Plaintiffs* Fresenius
     Medical Care Holdings, Inc.,
     d/b/a Fresenius Medical Care
     North America, and Fresenius
     Medical Care Orange County,
     LLC**

Washington, DC 20006
Telephone:    (202) 663-6440
Facsimile:     (202) 663-6363

/s/ Matthew Tymann
MATTHEW TYMANN (SBN 326249)
Matthew.Tymann@wilmerhale.com
WILMER CUTLER PICKERING
     HALE AND DORR LLP
350 South Grand Avenue, Suite 2100
Los Angeles, CA 90071
Telephone:    (213) 443-5343
Facsimile:     (213) 443-5400

***Attorneys for Plaintiff* DaVita Inc.**

/s/ Stuart S. Kurlander
STUART S. KURLANDER*
Stuart.Kurlander@lw.com
MICHAEL E. BERN*
Michael.Bern@lw.com
ABID R. QURESHI*
Abid.Qureshi@lw.com
LATHAM & WATKINS LLP
555 Eleventh Street NW
Washington, DC 20004
Telephone:    (202) 637-1021
Facsimile:     (202) 637-2201

/s/ Andrew Gray
ANDREW GRAY (SBN 254594)
Andrew.Gray@lw.com
LATHAM & WATKINS LLP
650 Town Center Drive, 20th Floor
Costa Mesa, CA 92626
Telephone:  (714) 755-8017
Facsimile:   (714) 755-8290

***Attorneys for Plaintiff* U.S. Renal
     Care, Inc.**

---

* *Pro hac vice* forthcoming.

## **ATTORNEY ATTESTATION**

Pursuant to Civil L.R. 5-4.3.4(a)(2)(i), the filer attests that all other signatories listed, and on whose behalf this filing is submitted, concur in the filing's content and have authorized the filing.

By: /s/ Matthew Tymann
Matthew Tymann