**UNITED STATES DISTRICT COURT**
**CENTRAL DISTRICT OF CALIFORNIA**

**<u>CIVIL MINUTES – GENERAL</u>**

Case No. SA CV 19-2105-DOC-ADS                              Date:  December 30, 2019
Case No. SA CV 19-2130-DOC-ADS

Title: JANE DOE ET AL. v. XAVIER BECERRA ET AL.; FRESENIUS MEDICAL CARE ORANGE COUNTY, LLC ET AL. v. XAVIER BECERRA ET AL.

PRESENT:

<u>THE HONORABLE DAVID O. CARTER, JUDGE</u>

| <u>Rolls Royce Paschal</u> | <u>Not Present</u> |
| :---: | :---: |
| Courtroom Clerk | Court Reporter |
| ATTORNEYS PRESENT FOR PLAINTIFF: | ATTORNEYS PRESENT FOR DEFENDANT: |
| None Present | None Present |

**PROCEEDINGS (IN CHAMBERS):**     **ORDER GRANTING MOTIONS FOR PRELIMINARY INJUNCTION [28/30]**

      Before the Court are two Motions for Preliminary Injunction (together, the "Motions"). The first ("*Doe* Motion") (*Doe* Dkt. 28) is brought by Plaintiffs Jane Doe, Stephen Albright, American Kidney Fund, Inc., and Dialysis Patient Citizens, Inc.; the second ("*Fresenius* Motion") (*Fresenius* Dkt. 30) is brought by Plaintiffs DaVita, Inc., Fresenius Medical Care Holdings, Inc. (doing business as Fresenius Medical Care North America), Fresenius Medical Care Orange County, LLC, and U.S. Renal Care, Inc.[1] Having reviewed the moving papers submitted by the parties and considered their oral arguments, the Court now GRANTS Plaintiffs' Motions.

---

[1] Throughout this Order, the Court will collectively refer to the plaintiffs in both actions as "Plaintiffs"; as necessary, the Court will also refer separately to the plaintiffs in each action as the "*Doe* Plaintiffs" and "*Fresenius* Plaintiffs."

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

CIVIL MINUTES – GENERAL

Case No. SA CV 19-2105-DOC-ADS  Date: December 30, 2019
Case No. SA CV 19-2130-DOC-ADS

Page 2

## I. Background

### A. Facts

The following facts are drawn from the *Fresenius* Complaint (*Fresenius* Dkt. 1); the *Doe* Motion; the *Fresenius* Motion; California's Opposition to the *Doe* Motion ("*Doe* Opposition") (*Doe* Dkt. 46); the Amicus Brief of the California State Conference of the National Association for the Advancement of Colored People ("California NAACP Amicus") (*Fresenius* Dkt. 44); the Amicus Brief of the California Medical Association ("CMA Amicus") (*Fresenius* Dkt. 48); the Supplemental Declaration of Donald J. Roy, Jr. ("Roy Declaration") (*Doe* Dkt. 54-1); and Assembly Bill No. 290, ch. 862, 2019 Cal. Stat. ___ [hereinafter AB 290] (to be codified at Cal. Health & Safety Code §§ 1210, 1367.016, 1385.09 and Cal. Ins. Code §§ 10176.11, 10181.8).

End-stage renal disease ("ESRD"), or kidney failure, is the last stage of chronic kidney disease. *Doe* Mot. at 1; *Fresenius* Mot. at 2. To survive with ESRD, patients must regularly undergo dialysis, which simulates the blood-filtration function of a working kidney. *Fresenius* Mot. at 2. Because dialysis only mitigates the effects of ESRD, patients eventually need a kidney transplant; however, due to the risks attendant on transplant surgery and the lack of available kidneys, many ESRD patients are either medically unsuited to a transplant or unable to receive a new kidney in a timely fashion. *Doe* Mot. at 1. As such, while imperfect, dialysis remains the only option for many ESRD patients. *Id.*

ESRD and dialysis, unfortunately, put patients in a perverse double bind. The specialized drugs and equipment involved make dialysis an expensive treatment, which few patients could afford without insurance. *Fresenius* Mot. at 2. But ESRD patients also typically require at least three dialysis treatments per week, lasting four hours each, rendering continued employment infeasible for many patients. *Id.* To stay alive, patients must therefore find a way to pay for expensive, long-term medical care, often without employer-provided insurance or the income to pay for insurance on their own. *See id.*

Enter Plaintiff American Kidney Fund, Inc. ("AKF"), a nonprofit that seeks to "alleviate the immense financial burdens faced by dialysis patients." *Doe* Mot. at 2. Through its Health Insurance Premium Program ("HIPP"), AKF gives financial assistance to 75,000 ESRD patients in the United States and 3756 in California. *Id.* This strictly need-based program helps patients pay for "health insurance [plans] that they have already selected and obtained but are unable to pay for alone." *Id.* AKF extends HIPP assistance to patients on both public and private insurance, helping them afford

**UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA**

**CIVIL MINUTES – GENERAL**

Case No. SA CV 19-2105-DOC-ADS    Date: December 30, 2019
Case No. SA CV 19-2130-DOC-ADS

Page 3

their plans and receive the lifesaving dialysis they need. *See Fresenius* Mot. at 4. Furthermore, AKF operates HIPP with approval from the U.S. Department of Health and Human Services ("HHS"), which found that HIPP is consistent with federal law prohibiting remuneration to Medicare recipients likely to influence choice of healthcare provider. *See Doe* Mot. at 3-4. HHS's Advisory Opinion 97-1 thus establishes a safe harbor for AKF, as long as HIPP does not change in a material way from the information provided to HHS (and upon which the agency based its approval). *Id.*

However, according to Defendants Xavier Becerra, Ricardo Lara, Shelly Rouillard, and Sonia Angell (sued in their official capacities, and hereinafter, collectively, "the State"), this system of financial assistance is less anodyne than it might appear. As the State argues, while the Medicare reimbursement rate for dialysis is below the cost of treatment, *Fresenius* Mot. at 4, private insurance plans reimburse dialysis providers at a significantly higher rate, *Doe* Opp'n at 4.[2] AKF, meanwhile, receives roughly eighty percent of its funding from Plaintiffs DaVita and Fresenius, the two largest dialysis providers in California. *Id.* at 3. And as of January 1, 2014, the Affordable Care Act has prohibited private insurance companies from rejecting enrollees based on their preexisting conditions. *See* AB 290 § 1(b); Tr. of Dec. 18, 2019 Oral Arg., Vol. I, at 44.

The California Legislature therefore found, consistent with mounting "nationwide concern," that both AKF and dialysis providers shared an incentive to steer patients into private insurance plans—which could no longer reject patients solely because of their preexisting ESRD—thereby securing higher reimbursement payouts for providers. *Doe* Opp'n at 4. The Legislature further identified several deleterious consequences that could result from this steering, such as unjust enrichment of providers, higher out-of-pocket costs to patients, and the distortion of the insurance risk pool. AB 290 § 1(a)-(e).[3]

To prevent the possibility of patient steering and its potential resultant harms, the State enacted AB 290 on October 13, 2019. *See* AB 290. The statute's provisions address the State's concern from several angles—regulating insurance companies, dialysis providers, and third-party payers like AKF by, *inter alia*, requiring third-party payers to inform applicants and recipients "of all available health coverage options," AB 290 § 3(b)(3); prohibiting dialysis providers and third-party payers from "steer[ing], direct[ing], or advis[ing]" patients towards particular insurance plans, *see id.* §§ 2(a),

---

[2] During oral argument, counsel for the *Fresenius* Plaintiffs estimated that the private reimbursement rate for dialysis is two to four times the Medicare rate. Tr. of Dec. 18, 2019 Oral Arg., Vol. I, at 76.
[3] For simplicity and clarity, the Court will refer to the sections of AB 290 as enacted rather than as codified.

Case 8:19-cv-02130-DOC-ADS Document 61 Filed 12/30/19 Page 4 of 17 Page ID #:663

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

CIVIL MINUTES – GENERAL

Case No. SA CV 19-2105-DOC-ADS　　　　　　　　　　　　　　　Date: December 30, 2019
Case No. SA CV 19-2130-DOC-ADS

Page 4

3(b)(4), 5(b)(4); requiring AKF to disclose its beneficiaries' names to their insurance companies, *id.* §§ 3(c)(2), 5(c)(2); and limiting private insurance reimbursement rates to the Medicare rate (or a rate determined through a "rate determination" process) when a patient with private insurance receives financial assistance from a third-party payer to which their dialysis provider donates, *id.* §§ 3(e)(1), 5(e)(1).

According to AKF, the strictures of AB 290 threaten numerous harms, the most severe of which would be forcing it to end HIPP in California. *See Doe* Mot. at 8. Compliance with AB 290, AKF argues, would require changes to HIPP not approved by HHS, and would remove the program from the safe harbor established by Advisory Opinion 97-1. *Id.* To protect HIPP throughout the rest of the United States, AKF would therefore need to withdraw the program from California. *Id.* Indeed, since October 1, 2019—the cutoff for HIPP recipients to be grandfathered under AB 290—AKF has not extended financial assistance to *any* new California patients, despite a historical average of accepting ninety new California HIPP recipients per month. AB 290 §§ 3(d)(1), 5(d)(1); Roy Decl. at 1. Without financial assistance from AKF, the majority of current HIPP recipients will be unable to afford insurance, even the relatively modest costs of Medicare. *Doe* Mot. at 7. As a result, many of the most financially and medically vulnerable Californians—all of whom are low income, and who are disproportionately people of color—will be left without access to life-sustaining medical care. Cal. NAACP Amicus at 3; CMA Amicus at 5.

### B. Procedural History

In response to the enactment of AB 290, the *Doe* Plaintiffs filed suit against the State on November 1, 2019, raising three causes of action:

(1) Federal preemption under the Supremacy Clause of the U.S. Constitution;
(2) Federal preemption under the Supremacy Clause of the U.S. Constitution;[4] and
(3) Abridgement of the rights of association, speech, and petition in violation of the First and Fourteenth Amendments to the U.S. Constitution.

*See generally Doe* Compl. On November 5, 2019, the *Fresenius* Plaintiffs filed suit as well, bringing the following six claims for relief:

---

[4] The first count is based on a theory of conflict preemption, *see Doe* Compl. ¶¶ 85, 90, whereas the second count alludes to both conflict and obstacle preemption, *id.* ¶¶ 92-95.

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

CIVIL MINUTES – GENERAL

Case No. SA CV 19-2105-DOC-ADS  Date: December 30, 2019
Case No. SA CV 19-2130-DOC-ADS

Page 5

> (1) Violation of the First and Fourteenth Amendment rights of speech and association;
> (2) Federal preemption under the Supremacy Clause of the U.S. Constitution;
> (3) Violation of the Contracts Clause of the U.S. Constitution;
> (4) Violation of the Due Process Clause of the U.S. Constitution;
> (5) Violation of the Takings Clause of the Fifth Amendment (incorporated against the states through the Fourteenth Amendment); and
> (6) Violation of the Due Process Clause of the U.S. Constitution.[5]

*See generally Fresenius* Compl. Both complaints seek a declaration that AB 290 is unconstitutional and injunctive relief against its enforcement. *See generally Doe* Compl.; *Fresenius* Compl.

Plaintiffs in both cases filed the instant Motions on November 8, 2019 (*Doe* Dkt. 28; *Fresenius* Dkt. 30). On November 25, 2019, the State filed its Opposition briefs (*Doe* Dkt. 46; *Fresenius* Dkt. 49), and Plaintiffs submitted their Reply briefs on December 2, 2019 (*Doe* Dkt. 49; *Fresenius* Dkt. 51). The Court held hearings on the instant Motions on December 16 and December 18, 2019.

## II. Legal Standard

A preliminary injunction is an "extraordinary remedy," requiring courts to balance competing claims on a case-by-case basis, with "particular regard for the public consequences" of issuing an injunction. *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 24 (2008). A plaintiff seeking preliminary injunctive relief "must establish that he is likely to succeed on the merits, that he is likely to suffer irreparable harm in the absence of preliminary relief, that the balance of equities tips in his favor, and that an injunction is in the public interest." *Am. Trucking Ass'ns, Inc. v. City of Los Angeles*, 559 F.3d 1046, 1052 (9th Cir. 2009) (quoting *Winter*, 555 U.S. at 20). Alternatively, an injunction can also be justified if a plaintiff raises "serious questions going to the merits" and the balance of hardships "tips sharply toward the plaintiff . . . assuming the other two elements of the *Winter* test are also met." *All. for the Wild Rockies v. Cottrell*, 632 F.3d 1127, 1132 (9th Cir. 2011). A "serious question" is one on which the movant "has a fair chance of success on the merits." *Sierra On-Line, Inc. v. Phx. Software, Inc.*, 739 F.2d

---

[5] The *Fresenius* Plaintiffs' fourth claim for relief is predicated on the protections of "life, liberty, or property," and of "certain fundamental rights," enshrined in the Due Process Clause of the Fourteenth Amendment. *Fresenius* Compl. ¶ 146. The sixth claim for relief is based on the legal theory that "[t]he Due Process Clause is violated where a person is penalized for the independent acts of others and for conduct over which the person had no ability to control." *See id.* ¶¶ 158-162.

**UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA**

**CIVIL MINUTES – GENERAL**

Case No. SA CV 19-2105-DOC-ADS
Case No. SA CV 19-2130-DOC-ADS

Date: December 30, 2019

Page 6

1415, 1421 (9th Cir. 1984). The Ninth Circuit follows a "sliding scale" approach to the four preliminary injunction elements, such that "a stronger showing of one element may offset a weaker showing of another, as long as plaintiffs 'establish that irreparable harm is *likely*.'" *Doe v. Kelly*, 878 F.3d 710, 719 (9th Cir. 2017) (quoting *Cottrell*, 632 F.3d at 1131).

### III. Discussion

In the instant Motions, Plaintiffs argue that if AB 290 is allowed to go into effect on January 1, 2020, it will infringe upon their constitutional rights, create conflicts with federal law, and force AKF to withdraw HIPP from California, threatening low-income dialysis patients' access to care. As such, they seek a preliminary injunction against AB 290, pending the outcome of this litigation, to prevent these imminent and irreparable harms.

### A. Plaintiffs Have Demonstrated Sufficient Likelihood of Success on the Merits

Plaintiffs' Motions challenge many (perhaps most) of AB 290's substantive provisions as either preempted by federal law or in violation of the First Amendment. Two of Plaintiffs' First Amendment challenges are dispositive of the Motions: First, that the prohibition on "steer[ing], direct[ing], or advis[ing]" patients (the "Steering Ban"), AB 290 §§ 2(a), 3(b)(4), 5(b)(4), is an undue burden on speech; and second, that the reduction of private insurance reimbursement rates to the Medicare rate (the "Reimbursement Cap"), *id.* §§ 3(e)(1), 5(e)(1), is an undue burden on association or speech. The Court considers each of these claims in turn.

#### 1. Plaintiffs Are Likely to Succeed on Their First Amendment Claims Against the Prohibition on Steering, Directing, or Advising Patients

The Steering Ban mandates that dialysis providers "shall not steer, direct, or advise a patient regarding any specific coverage program option or health care service plan contract," AB 290 § 2(a); similarly, third-party payers like AKF "shall agree not to steer, direct, or advise the patient [or "the insured"] into or away from a specific coverage program option or health care service plan contract," *id.* §§ 3(b)(4), 5(b)(4).

**UNITED STATES DISTRICT COURT**
**CENTRAL DISTRICT OF CALIFORNIA**

**CIVIL MINUTES – GENERAL**

Case No. SA CV 19-2105-DOC-ADS  Date: December 30, 2019
Case No. SA CV 19-2130-DOC-ADS

Page 7

### a. The Steering Ban Can Withstand Neither Strict nor Intermediate Scrutiny

Plaintiffs argue that the Steering Ban is a content- and/or speaker-based restriction on speech. Such laws are "presumptively unconstitutional" and are subject to strict scrutiny; that is, they are upheld "only if the government proves that they are narrowly tailored to serve compelling state interests." *Reed v. Town of Gilbert*, 135 S. Ct. 2218, 2226 (2015) (citations omitted).[6] The State responds that, because the Steering Ban does not limit Plaintiffs' ability to provide factual information to patients, it cannot be a content- or speaker-based restriction.

Perhaps tellingly, the State's Opposition briefs cite no case law to support the proposition that a restriction on speech is not content- or speaker-based as long as it does not burden the right to communicate factual information.[7] *Reed*, meanwhile, suggests just the opposite, characterizing laws that "defin[e] regulated speech by particular subject matter . . . [or] by its function or purpose" as two types of content-based restrictions. 135 S. Ct. at 2227. At oral argument, counsel for the State instead argued that the Steering Ban is properly classified as regulation of commercial speech, subject to intermediate scrutiny. *See* Tr. of Dec. 18, 2019 Oral Arg., Vol. I, at 45-49. But the differences between these standards are immaterial here; the State has not met its burden under either strict or intermediate scrutiny.

### b. The State Has Not Demonstrated a Compelling or Substantial Governmental Interest in the Steering Ban

As the Supreme Court held in *Edenfield v. Fane*, 507 U.S. 761 (1993), even when regulating commercial speech, the burden of justifying the restriction "is not satisfied by mere speculation or conjecture; rather, a governmental body seeking to sustain a restriction on commercial speech must demonstrate that the harms it recites are real and that its restriction will in fact alleviate them to a material degree." 507 U.S. at 770-71 (citations omitted).

---

[6] Plaintiffs further contend that the Steering Ban is unconstitutionally vague and overbroad, particularly with respect to the term "advise," noting that the line between information and advice is often blurred; would a provider, for instance, be liable under the Steering Ban merely for answering a patient's question about whether an insurance plan can cover their family members? The State responds that "steer" and "direct" give sufficient context to clarify and limit the scope of "advise." While the Court finds Plaintiffs' argument more persuasive, this Order does not turn on this challenge to the Steering Ban, and the Court need not discuss it further at this time.

[7] Even if the Court were to adopt the State's "factual information" standard, it is by no means clear that the Steering Ban would not limit a provider or third-party payer's ability to provide factual information, as noted above in Footnote 6.

**UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA**

**CIVIL MINUTES – GENERAL**

Case No. SA CV 19-2105-DOC-ADS  Date: December 30, 2019
Case No. SA CV 19-2130-DOC-ADS

Page 8

The State, pointing to the California Legislature's findings in AB 290, argues that it has identified a compelling interest to support the Steering Ban—viz., preventing patient steering, which can harm patients, distort the insurance risk pool, and unjustly enrich dialysis providers. But several of the Legislature's findings are just the sort of speculative harms the Supreme Court has ruled insufficient. AB 290 asserts, for example, that "[e]ncouraging patients to enroll in commercial insurance coverage for the financial benefit of the provider *may* result in an unjust enrichment . . . [which] *can* expose patients to direct harm"; that "patients caught up in these schemes *may* face higher out-of-pocket costs and mid-year disruptions, and *may* have a more difficult time obtaining critical care"; and that patients face "*potential* harm caused by being steered into coverage options that *may* not be in their best interest." AB 290 § 1(c)-(d), (i) (emphasis added). This hypothetical phrasing calls into question whether these recited harms are real—and, as Plaintiffs observe, and the State does not dispute, the State has yet to identify a single California patient steered into a private insurance plan by a dialysis provider or third-party payer.

Moreover, the relevant harms AB 290 couches in more definite language—that patient steering forces consumers to "pay higher health insurance premiums due to the distortion of the insurance risk pool," and that "[AKF] generates hundreds of millions of dollars for large dialysis organizations by artificially increasing the number of their patients who have commercial insurance coverage," *id.* § 1(e), (h)—are themselves predicated on the actuality of patient steering, when, again, the State has not identified *any* steered California patients. Nor is it clear, at this juncture, whether the insurance risk pool has been or will be distorted; as the State's counsel explained at oral argument, one matter the State hopes to develop in discovery are "some expert reports . . . to demonstrate how exactly the steering practices affect the insurance risk pool, the economics of that." Tr. of Dec. 18, 2019 Oral Arg., Vol. I, at 55-56. If these harms were real, rather than speculative or conjectural, the State, it seems, would *already* understand and be able to demonstrate these economic effects—and one would certainly expect to find more than the anemic allegation of risk-pool distortion in AB 290 § 1(e).

As a result, even assuming the Steering Ban regulates only commercial speech, the State has not "demonstrate[d] that the harms it recites are real." *See Edenfield*, 507 U.S. at 771. The supposed harms are too speculative and conjectural to sustain the State's burden even under intermediate scrutiny.

**UNITED STATES DISTRICT COURT**
**CENTRAL DISTRICT OF CALIFORNIA**

**CIVIL MINUTES – GENERAL**

Case No. SA CV 19-2105-DOC-ADS                                                         Date: December 30, 2019
Case No. SA CV 19-2130-DOC-ADS

Page 9

### c. The Steering Ban Is Not Narrowly Tailored

While the State's purported interest fails to satisfy the requirements of either strict or intermediate scrutiny, it is worth briefly noting that, if strict scrutiny applies, the Steering Ban is also defective for lack of narrow tailoring. In *Victory Processing, LLC v. Fox*, 937 F.3d 1218 (9th Cir. 2019), the Ninth Circuit explained that "when the plaintif offers 'a plausible, less restrictive alternative . . . to a content-based speech restriction, it is the Government's obligation to prove that the alternative will be ineffective to achieve its goals.'" 937 F.3d at 1228 (omission in original) (quoting *United States v. Playboy Entm't Grp., Inc.*, 529 U.S. 803, 813 (2000)).

Here, the *Fresenius* Plaintiffs have offered one such plausible alternative, "a targeted prohibition against steering rather than a total ban on advising," suggesting that the State could rely on antifraud law to protect patients and increase its own educational efforts to provide patients with adequate information about insurance options. *Fresenius* Mot. at 11-12. While the State's Opposition claims that AB 290 as written "zero[es] in on the specific [steering] behavior," *Fresenius* Opp'n at 13, it makes no effort to address the suggested alternative or explain why it would be inadequate.

Plaintiffs have therefore shown a likelihood of success on the merits of their First Amendment claims against the Steering Ban. The State has not demonstrated a sufficient non-speculative interest to survive either strict or intermediate scrutiny—nor, if strict scrutiny applies, has the State carried its burden to prove narrow tailoring.

### 2. Plaintiffs Raise Serious Questions on the Merits of Their First Amendment Claims Against the Reimbursement Cap

The Reimbursement Cap provides that if "a contracted financially interested provider . . . has a financial relationship with the entity making the third-party premium payment, the amount of reimbursement for covered services . . . shall be the higher of the Medicare reimbursement rate or the rate determined pursuant to" an "independent dispute resolution process" to be established by the State. AB 290 § 3(e)(1), (f)(1).[8] Essentially, if a dialysis provider donates to AKF, and AKF helps a patient with that provider pay for private insurance, the provider's reimbursement for that patient will be limited to the Medicare rate (or the independent dispute resolution rate).

---

[8] Section 5(e)(1) similarly provides that "the amount of reimbursement for covered services . . . shall be governed by the higher of the Medicare reimbursement or the rate determined pursuant to" the "independent dispute resolution process." AB 290 § 5(e)(1), (f)(1).

Case 8:19-cv-02130-DOC-ADS  Document 61  Filed 12/30/19  Page 10 of 17  Page ID #:669

**UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA**

**CIVIL MINUTES – GENERAL**

Case No. SA CV 19-2105-DOC-ADS  Date: December 30, 2019
Case No. SA CV 19-2130-DOC-ADS

Page 10

      **a.**      **Charitable Relationships Are Protected by the First Amendment, and Burdens Thereupon Are Subject to Strict Scrutiny**

Plaintiffs argue that the Reimbursement Cap burdens the right of association and/or speech[9] by penalizing dialysis providers when they choose to associate with (or express support for) a charity like AKF via financial contribution. The State disagrees, instead characterizing the Reimbursement Cap as a limit on the amount of money a dialysis provider can collect from private insurers when the patient receives financial assistance from an entity to which the provider donates. The State further argues that while charitable contributions may be protected speech or association, collection of insurance reimbursements is not, and thus limiting insurance reimbursements does not curtail any First Amendment right.

At the outset, as the State concedes, financial contributions can be a means of forming an association or affiliation, *McCutcheon v. FEC*, 572 U.S. 185, 203 (2014) (plurality opinion), and in "charitable and political contexts" are protected under the First Amendment, *Kamerling v. Massanari*, 295 F.3d 206, 214 (2d Cir. 2002). The State attempts to sidestep this protection by classifying the Reimbursement Cap as a restriction on merely economic activity or nonexpressive conduct—i.e., collecting insurance reimbursements—but this argument is unavailing. As Plaintiffs argue, no matter how the Reimbursement Cap is characterized, it *functionally* burdens dialysis providers' freedom to contribute to third-party payers by strongly disincentivizing such contributions. As the Supreme Court has held, financial burdens on First Amendment expression "operate as disincentives to speak," even if the burdens are incurred in an indirect fashion. *See Simon & Schuster, Inc. v. Members of the N.Y. State Crime Victims Bd.*, 502 U.S. 105, 117 (1991). Thus, far from being just an "incidental burden" on First Amendment activity, the Reimbursement Cap "in its practical operation" burdens protected expression and is subject to "heightened judicial scrutiny." *See Sorrell v. IMS Health Inc.*, 564 U.S. 552, 567 (2011).

The foregoing uncritically assumes, however, that the donations from providers to third-party payers are in fact charitable, and here the State's argument does highlight an important consideration. The Reimbursement Cap could plausibly be framed as a

---

[9] The briefing pivots fluidly between "speech" and "association" when discussing the Reimbursement Cap. There does not, however, appear to be any meaningful difference between the two analyses, and the *Fresenius* Plaintiffs helpfully supply the term "protected First Amendment activity." *See Fresenius* Reply (*Fresenius* Dkt. 51) at 8.

**UNITED STATES DISTRICT COURT**
**CENTRAL DISTRICT OF CALIFORNIA**

**CIVIL MINUTES – GENERAL**

Case No. SA CV 19-2105-DOC-ADS                                                                  Date: December 30, 2019
Case No. SA CV 19-2130-DOC-ADS

Page 11

restriction on economic activity or nonexpressive conduct—not, as the State suggests, because it merely limits insurance payouts, but because a question of fact exists as to whether the donations from providers to third-party payers are actually charitable in nature. Put differently, while Plaintiffs assert that the donations are an expressive avenue by which providers join and support AKF's mission, one could reasonably believe that these contributions constitute only an elaborate system of financial self-dealing. The California Legislature found, for example, that the donations resulted in AKF "generat[ing] hundreds of millions of dollars" for dialysis providers. *See* AB 290 § 1(h).

It could at least *appear*, then, that large dialysis providers donate to AKF not for First Amendment expressive or associative reasons, but for the essentially economic or nonexpressive purpose of using their contributions to secure a later "return on investment" in the form of higher private insurance reimbursements. And while the First Amendment protects with strict scrutiny the right to associate "in pursuit of a wide variety of political, social, economic, educational, religious, and cultural ends," *Roberts v. U.S. Jaycees*, 468 U.S. 609, 622-23 (1984), it is not clear whether the providers' system of contributions is actually under the aegis of the First Amendment.

This, of course, is a factual determination, better left for a later stage of this litigation when a more complete record has been developed. The Court at present cannot and does not decide whether the donations from dialysis providers to third-party payers are within the category of protected First Amendment activity (e.g., "[t]he right to associate *for expressive purposes*," *see U.S. Jaycees*, 468 U.S. at 623 (emphasis added)), or whether they merely constitute nonexpressive commercial or economic conduct.

                    **b.**     **If Strict Scrutiny Applies, the State Has Not Shown a Compelling State Interest in the Reimbursement Cap**

If the donations are in fact protected by the First Amendment, then the Reimbursement Cap will be subject to strict scrutiny. *See U.S. Jaycees*, 468 U.S. at 623 ("Infringements on [the right to associate] may be justified by regulations adopted to serve compelling state interests . . . that cannot be achieved through means significantly less restrictive."). As discussed above, with respect to the Steering Ban, the interests asserted by the State are too speculative to pass even intermediate scrutiny under *Edenfield*. *Supra* at 7-8. It follows—obviously—that these conjectural harms are also inadequate to withstand strict scrutiny under *U.S. Jaycees*.

**UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA**

**CIVIL MINUTES – GENERAL**

Case No. SA CV 19-2105-DOC-ADS  
Case No. SA CV 19-2130-DOC-ADS

Date: December 30, 2019

Page 12

### c. If Strict Scrutiny Applies, the Reimbursement Cap Is Not Narrowly Tailored

*U.S. Jaycees* also requires that a restriction on "[t]he right to associate for expressive purposes" be narrowly tailored, such that the compelling interest it serves "cannot be achieved" with a "significantly less restrictive" provision. 468 U.S. at 632. The Reimbursement Cap does not satisfy this criterion. As Plaintiffs note, the Reimbursement Cap operates without regard to the size of the contribution to the third-party payer—that is, even negligible donations will trigger the full effect of the Reimbursement Cap. Similarly, the Reimbursement Cap sets no temporal limits, apparently applying to any provider that has *ever* donated to a third-party payer. If the California Legislature intended the Reimbursement Cap to remove the potentially nefarious incentive to steer dialysis patients into private insurance plans, surely this same goal could be achieved by a more limited provision—one that would not sweep in all 60,000 of AKF's donors, *see Fresenius* Mot. at 5, irrespective of how much they contributed to AKF and when.

Furthermore, the *Fresenius* Plaintiffs offer two alternatives to the Reimbursement Cap, viz., directly regulating insurance rates and/or "impos[ing] targeted and administrable prohibitions" on patient steering. *Fresenius* Mot. at 16. While the latter offers basically zero descriptive content, the former presents "a plausible, less restrictive alternative" to the Reimbursement Cap. *Victory Processing*, as discussed above in the context of the Steering Ban, *supra* at 9, therefore requires the State to explain why this alternative would not allow it to achieve its goals. The State, however, has not addressed this proposed alternative, and thus has not met its obligation to demonstrate narrow tailoring.

Because Plaintiffs have shown that they "ha[ve] a fair chance of success on the merits," *see Sierra On-Line*, 739 F.2d at 1421, they have raised serious questions on the merits of their First Amendment challenge to the Reimbursement Cap. Should strict scrutiny turn out to be the appropriate standard, the State has not met its burden to show that the Reimbursement Cap is narrowly tailored or that it serves a compelling state interest.

### B. The Suspect Provisions Are Not Severable Under California Law

Before addressing the remaining elements of the *Winter* test for a preliminary injunction, it is necessary to determine whether the Steering Ban and Reimbursement Cap

**UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA**

**CIVIL MINUTES – GENERAL**

Case No. SA CV 19-2105-DOC-ADS  
Case No. SA CV 19-2130-DOC-ADS

Date: December 30, 2019

Page 13

are severable under California severability law. The California Supreme Court has established a two-step test to guide this inquiry.

### 1. AB 290 Does Not Contain a Severability Clause

First, the reviewing court must look to any severability clause, the presence of which "establishes a presumption in favor of severance." *Cal. Redevelopment Ass'n v. Matosantos*, 53 Cal. 4th 231, 271 (2011) (citing *Santa Barbara Sch. Dist. v. Superior Court*, 13 Cal. 3d 315, 331 (1975)). AB 290 does not contain a severability clause, so the Court must proceed to the second step of the analysis.

### 2. The Suspect Provisions Are Not Functionally Separable from the Remainder of AB 290

If a statute does not contain a severability clause, the reviewing court may nevertheless find a portion of the statute severable if that provision is "grammatically, functionally, and volitionally separable." *Matosantos*, 53 Cal. 4th at 271 (citing *Calfarm Ins. Co. v. Deukmejian*, 48 Cal. 3d 805, 821 (1989)). "Grammatical separability" considers whether the invalid portion of the statute can be stricken "'without affecting the wording' or coherence of what remains." *Id.* (quoting *Calfarm*, 48 Cal. 3d at 822). "Functional separability" turns on whether the rest of the statute "is complete in itself." *Id.* (quoting *Sonoma Cty. Org. of Pub. Emps. v. County of Sonoma*, 23 Cal. 3d 296, 320 (1979)). And "volitional separability" obtains when the statute "would have been adopted" even if the legislative body had "foreseen the partial invalidation of the statute." *Id.* (citations omitted).

Here, the Steering Ban and Reimbursement Cap are not "functionally separable" and thus cannot be severed from the rest of AB 290. As AB 290 says, and counsel for the State represented at oral argument, the key purpose of AB 290 is to prevent patient steering and the potential ills attendant thereon. *See* AB 290 § 1(c)-(e), (i); Tr. of Dec. 18, 2019 Oral Arg., Vol. I, at 79 ("[T]he point of the statute is to make sure patients are making decisions"—i.e., not being steered—"and to protect the risk pools"—which are allegedly threatened by patient steering.). The Steering Ban and Reimbursement Cap, in turn, are the critical provisions aimed at achieving that goal; the Steering Ban directly prohibits patient steering, while the Reimbursement Cap negates the financial incentive to steer patients into private insurance.

Taken separately, either of these provisions likely would be severable; if only one were enjoined, the other would still be working to realize AB 290's goal of preventing

**UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA**

**CIVIL MINUTES – GENERAL**

Case No. SA CV 19-2105-DOC-ADS    Date: December 30, 2019
Case No. SA CV 19-2130-DOC-ADS

Page 14

patient steering, much like redundant systems in engineering. If both were enjoined, however, the anti-steering mechanisms of AB 290 would be almost entirely nullified. With neither the Steering Ban nor the Reimbursement Cap in force, AB 290 could do almost nothing to prevent patient steering, and thus would not be "complete in itself." As the combined effect of the Steering Ban and the Reimbursement Cap is not functionally separable from the remainder of AB 290, California severability law dictates that these provisions cannot be severed and separately enjoined.

AB 290 must therefore either be enjoined in its entirety or take effect in its entirety—a conclusion with important implications for the discussion of the remaining *Winter* elements.

### C.   Plaintiffs Face Irreparable Injury If AB 290 Is Not Enjoined

"It is well established that the deprivation of constitutional rights 'unquestionably constitutes irreparable injury.'" *Hernandez v. Sessions*, 872 F.3d 976, 994 (9th Cir. 2017) (quoting *Melendres v. Arpaio*, 695 F.3d 990, 1002 (9th Cir. 2012)).[10] The Court has, of course, just found that Plaintiffs are likely to succeed on their challenge to the Steering Ban, and have raised at least serious questions on the merits of their claim against the Reimbursement Cap. There exists accordingly a sufficient likelihood that these provisions of AB 290 are unconstitutional and will deprive Plaintiffs of their First Amendment rights if allowed to take effect. In other words, given the Court's conclusions on Plaintiffs' likelihood of success on the merits, "it follows inexorably . . . that Plaintiffs have also carried their burden as to irreparable harm." *Id.* at 995.

Thus, without an injunction, come January 1, 2020, Plaintiffs are likely to suffer irreparable injury to their First Amendment rights of expression and association.

In addition, Plaintiffs Jane Doe and Stephen Albright suffer from ESRD, require regular dialysis, and depend on financial assistance from AKF. *Doe* Mot. at 2, 23. If AB 290 goes into effect on January 1, 2020, as mentioned above, AKF has represented that it will stop operating HIPP in California in order to avoid perceived conflicts with federal law and protect the program in the rest of the United States. This will leave Plaintiffs Doe and Albright unable to afford their health insurance coverage, which may disrupt their treatment or delay their receipt of a kidney transplant. *Id.* at 23. A potential

---

[10] *Melendres* itself quotes the plurality opinion in *Elrod v. Burns*, 427 U.S. 347 (1976), in which Justice Brennan wrote that "[t]he loss of First Amendment freedoms, for even minimal periods of time, unquestionably constitutes irreparable injury." 427 U.S. at 373.

**UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA**

**CIVIL MINUTES – GENERAL**

Case No. SA CV 19-2105-DOC-ADS                                                                 Date: December 30, 2019
Case No. SA CV 19-2130-DOC-ADS

Page 15

denial of "needed medical care" is commonly sufficient to establish a risk of irreparable injury. *See M.R. v. Dreyfus*, 697 F.3d 706, 732 (9th Cir. 2012) (numerous citations omitted).

The Court finds that Plaintiffs Doe and Albright face serious risks to their continued access to treatment, and have thus met their burden to show irreparable injury. It is worth noting, moreover, that although AKF's potential withdrawal would be predicated on its worries about federal preemption, rather than its likely First Amendment injuries, California severability law prevents the Court from enjoining only the Steering Ban and the Reimbursement Cap. As such, if AB 290 is not enjoined, *all* of AB 290 will come into effect, at which point AKF will feel compelled to end HIPP in California—and these harms to Plaintiffs Doe and Albright, though unrelated to the First Amendment, will also come to pass.

Plaintiffs have thus clearly demonstrated a risk of irreparable injury in the absence of a preliminary injunction.

### D.     The Balance of the Equities Tips Sharply in Favor of an Injunction

After the first two elements for a preliminary injunction are satisfied, the Court must "assess[] the harm to the opposing party and weigh[] the public interest." *Nken v. Holder*, 556 U.S. 418, 435 (2009). These elements merge into a single inquiry when the injunction is sought against the government. *Id.* The Court therefore considers in turn the potential harm in issuing a preliminary injunction as well as the likely benefit.

#### 1.     A Preliminary Injunction Will Not Harm the Public Interest

As mentioned at multiple points in this Order, the purported interest animating AB 290 is to prevent patient steering and its resultant harms, such as distortions to the insurance risk pool and rising costs. However, as discussed above, the harms the State identifies are too speculative to constitute a compelling or substantial government interest. So too as regards preliminary injunctive relief; given the conjectural nature of these harms, it is unlikely that a preliminary injunction will inflict any real harm on California patients or the insurance market, especially within the accelerated litigation timeline of six to seven months proposed by the Court and amenable to the parties. *See, e.g.*, Tr. of Dec. 18, 2019 Oral Arg., Vol. I, at 55 ("Your Honor, your estimate of June or July, I think, could be acceptable.").

**UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA**

**CIVIL MINUTES – GENERAL**

| | |
|---|---|
| Case No. SA CV 19-2105-DOC-ADS<br>Case No. SA CV 19-2130-DOC-ADS | Date: December 30, 2019 |
| | Page 16 |

The State correctly observes that whenever "a State is enjoined by a court from effectuating statutes enacted by representatives of its people, it suffers a form of irreparable injury." *Maryland v. King*, 567 U.S. 1301, 1301 (2012) (citation omitted). However, it should not be overlooked that the guaranteed issue provision of the Affordable Care Act, which prohibits insurance companies from declining policies on the basis of preexisting conditions, took effect on January 1, 2014. It was thus from that date forward that dialysis providers could run the patient-steering insurance "schemes" that motivated the State to enact AB 290. *See* AB 290 § 1. But as counsel for the State explained at oral argument, it was not until 2016 that the Centers for Medicare and Medicaid Services "began looking into these arrangements," and the California Legislature first introduced a bill similar to AB 290 in February 2018. Tr. of Dec. 18, 2019 Oral Arg., Vol. I, at 45. All told, there are six years to the day between the date the guaranteed issue provision came into force and the date AB 290 is set to take effect. Given how much time has already elapsed, any burden stemming from an additional delay of six to seven months, pending the resolution of this case at summary judgment or trial, is likely to be negligible.

## 2. A Preliminary Injunction Will Serve the Public Interest

On the other hand, there is a significant public interest in enjoining AB 290 while this case is litigated. Over 3700 ESRD patients in California rely on financial assistance from AKF to get dialysis; if HIPP is withdrawn, they face potentially life-threatening disruptions in treatment and displacement from transplant waiting lists. And, again, AKF has repeatedly represented that it will cease to operate HIPP in California if AB 290 takes effect, in order to avoid any conflict with federal law and keep HIPP within the bounds of its safe harbor. Indeed, an estimated average of ninety California patients per month have already been declined HIPP assistance since October 1, 2019, the cutoff for patients to fall under AB 290's grandfathering provisions. If AB 290 is not enjoined pending review, thousands of California HIPP recipients—who number among the poorest and most medically vulnerable of all Californians—may not be able to afford the dialysis treatments that keep them alive (or may be forced to dedicate all of their scant financial resources to medical care) and may face further delays in receiving a transplant.

And as counsel for the State admitted at oral argument, "the State cannot guarantee that no patients will experience a lapse in their coverage if AKF, in fact, leaves the state . . . the State cannot represent to the Court that no patients would experience an interruption in their coverage." Tr. of Dec. 16, 2019 Oral Arg., Vol. II, at 13. A preliminary injunction would therefore serve a dire public interest by ensuring that HIPP

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

CIVIL MINUTES – GENERAL

| | |
|---|---|
| Case No. SA CV 19-2105-DOC-ADS<br>Case No. SA CV 19-2130-DOC-ADS | Date: December 30, 2019 |
| | Page 17 |

recipients are able to continue receiving the financial assistance they need, so that their insurance coverage and life-sustaining ESRD treatment can continue uninterrupted.[11]

Finally, the Court notes that there is a general public interest in preventing state governments from violating constitutional rights. *Ariz. Dream Act Coal. v. Brewer*, 757 F.3d 1053, 1069 (9th Cir. 2014) (citations omitted). Plaintiffs, for their part, have demonstrated a sufficient likelihood that just such harms will follow if AB 290 is not enjoined. Considering both the likelihood that AB 290 will abridge Plaintiffs' constitutional rights and the extreme medical risks it poses to thousands of ESRD patients, the Court finds it obvious that the public interest favors a preliminary injunction, and that the balance of the hardships tilts strongly in Plaintiffs' favor.

All of the elements for issuing a preliminary injunction have therefore been satisfied: Plaintiffs are likely to succeed on one issue and have raised serious questions on the merits for another; Plaintiffs are likely to be irreparably harmed absent an injunction; and the balance of hardships, taking into account the effects of an injunction on the public, strongly favors granting injunctive relief.

## IV. Disposition

For the reasons set forth above, the Court GRANTS Plaintiffs' Motions for a Preliminary Injunction. AB 290, in its entirety, shall not come into effect pending the resolution of this litigation.

The Clerk shall serve this minute order on the parties.

| | |
|---|---|
| MINUTES FORM 11 | Initials of Deputy Clerk: rrp |
| CIVIL-GEN | |

---

[11] As explained above, AKF represents that it would stop operating HIPP in California to avoid conflict with federal law, whereas this Order has considered only two of Plaintiffs' First Amendment claims. Again, however, under California severability law, the Court can only enjoin AB 290 or let it stand *as a whole*; the Court thus finds it appropriate to consider the entire range of consequences that would flow from granting or denying a preliminary injunction, not just those immediately related to the First Amendment claims.